# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## MCALLEN DIVISION

| | | |
|---|---|---|
| **RODOLFO ALVAREZ MEDRANO,** | § | |
| | § | |
| **Petitioner** | § | |
| **VS.** | § | **CIVIL ACTION NO. 7:17-CV-00069** |
| | § | |
| **LORIE DAVIS,** | § | ***DEATH PENALTY CASE*** |
| | § | |
| **Respondent.** | § | |

## REPLY TO RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AND ANSWER AND CONDITIONAL MOTION FOR AN EVIDENTIARY HEARING

Respondent has moved for summary judgment.  Because Petitioner has alleged facts, which if true, would support a grant of relief, summary judgment is impermissible.  The First Amended Petition sets forth both multiple legal theories that would ground relief, and facts sufficient to support those theories. Although Respondent has not presented evidence impeaching Petitioner's allegations, it has alleged a variety of procedural and substantive defenses to Petitioner's claims.

Petitioner first disputes Respondent's procedural claims, and then addresses its substantive arguments. This Court should, pursuant to  28 U.S.C. §§ 2254(b) and (c), *Rhines v. Weber*, 544 U.S.

269 (2005), *Pace v. DiGuglielmo*, 544 U.S. 408 (2005), and other applicable law, grant Petitioner's pending motion for a stay to pursue his state court remedies with respect to Ground III. In the alternative, this Court should grant relief on Grounds IV, V, VI, VII, or VIII.

If this Court does neither, as explained below, Petitioner moves this court for an evidentiary hearing to enable him to present further evidence both as to the Respondent's allegations of procedural default, and as to the merits of his claims.

## RESPONDENT'S ARGUMENTS REGARDING PROCEDURAL BARRIERS TO PETITIONER'S CLAIMS

**I.      GROUND III IS NOT PROCEDURALLY DEFAULTED**

### A.  Summary of Argument

The State has an affirmative duty to disclose evidence that is both "favorable to [the] accused" and "material." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "Favorable" or "exculpatory" evidence includes information that directly tends to make the defendant's innocence more likely, but it also encompasses facts that impeach a government witness. *See Giglio v. United States*, 405 U.S. 150, 154 (1972); *Tassin v. Cain*, 517 F.3d 770, 777 (5th Cir. 2008). Favorable evidence includes "undisclosed evidence demonstrat[ing] that *the prosecution's case include[d] perjured testimony* and that the prosecution knew, or should have known, of the perjury" because "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (emphasis added); *see also Kyles v. Whitley*, 514 U.S. 419, 433 n.7 (1995); *United States v. Bagley*, 473 U.S. 667, 678–80 n.8 (1985); *McCormick v. Parker*, 821 F.3d 1240, 1247–48 (10th Cir. 2016). Here, the State violated

2

Petitioner's due process rights when it failed to disclose evidence about Detective Robert Alvarez's perjured testimony about his qualifications as a gang expert, and false and inaccurate testimony about gang membership, gang identification, and the modus operandi of gangs.[1] All this evidence was favorable to Petitioner and material to both guilt and sentencing. *See* First Am. Pet. at 86–90.

### B.  Statement of Relevant Facts

All of the facts alleged in the First Amended Petition are incorporated by reference as support for these claims. Ground III is not exhausted. It was not raised at trial or on direct appeal. It was  not raised in post-conviction proceedings or on appeal from post-conviction proceedings.

### C.  Petitioner Has an Available State Remedy

At the time of this filing, a motion to stay proceedings pending exhaustion of state remedies, filed pursuant to 28 U.S.C. §§ 2254(b)–(c), *Rhines v. Weber*, 544 U.S. 269 (2005), *Pace v. DiGuglielmo*, 544 U.S. 408 (2005), and other applicable law, is pending in this Court. Because Petitioner has an available state court remedy, as set forth in his motion for a *Rhines* stay and Reply to Respondent's Answer, this is a mixed petition, and this Court should grant the motion to stay proceedings, thereby allowing Petitioner to return to state court and afford the state courts the first opportunity to make the factual findings upon which this claim depends.

### D.  Petitioner's Default, if any, is Excused by Cause

In the alternative, Petitioner's default is excused by cause. "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural

---

[1] The factual basis for this claim is set forth in more detail in First Am. Pet. at 53–82.

rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). "[A] showing that the factual or legal basis for a claim was not reasonably available to counsel, or that 'some interference by officials,' made compliance impracticable, [constitutes] cause under this standard." *Id.* (citations omitted). Where the suppression of documents is fairly attributable to the State, and that suppression has impeded "access to the factual basis for making a Brady claim[,] . . . such factors [] ordinarily establish the existence of cause for a procedural default." *Strickler v. Greene*, 527 U.S. 263, 283 (1999); *see also Amadeo v. Zant*, 486 U.S. 214 (1988) (Where a memorandum was not reasonably discoverable because it was concealed by county officials, "and that concealment, rather than tactical considerations, was the reason for the failure of petitioner's lawyers to raise the jury challenge in the trial court, the petitioner established ample cause to excuse his procedural default.").

The State continued throughout state court proceedings, to conceal the falsity of its witness's testimony, and that continued concealment constitutes cause.  Below, in his discussion of Respondent's merits arguments with respect to Ground III, Petitioner  replies to Respondent's contentions regarding materiality. Doing so addresses and satisfies the prejudice requirement for overcoming procedural default because "[C]oincident with the third Brady component . . . . , prejudice within the compass of the 'cause and prejudice' requirement exists when the suppressed evidence is 'material' for Brady purposes." *Banks v Dretke*, 540 U.S. 668, 691 (2004); *see also Strickler*, 527 U.S. at 282 ("In this case, cause and prejudice parallel two of the three components of the alleged Brady violation itself. . . . [U]nless [the concealed] documents were 'material' for Brady  purposes, their  suppression  did  not  give  rise to sufficient prejudice to  overcome the procedural default.").

Should this Court determine that Petitioner's allegations and evidence regarding cause and prejudice are insufficient to clearly establish them, he moves for, and as discussed below, is entitled to, a hearing on those allegations to enable him to present additional evidence.

## II. *MARTINEZ V. RYAN* PROVIDES AN EXCEPTION TO PROCEDURAL DEFAULT AS TO GROUNDS VII(2), VII(3), VII(4), VII(6), AND VII(7) (AND THE RELATED SUBSTANTIVE CLAIMS, II AND III) BECAUSE POST-CONVICTION COUNSEL WAS INEFFECTIVE FOR FAILING TO ASSERT THEM.

### A. Summary of Argument.

Any procedural default triggered by the failure of post-conviction counsel to raise the ineffective assistance of trial counsel ("IATC") claims set forth in the First Amended Petition is excused under *Martinez v. Ryan*, 566 U.S. 1 (2012), which held that ineffective state post-conviction representation can excuse procedural default of an IATC claim. Post-conviction counsel's performance, in failing to raise several viable IATC claims, with no plausible strategic reason for failing to do so, was deficient and prejudicial to Petitioner, thereby satisfying the ineffective assistance of counsel test laid out in *Strickland v. Washington,* 466 U.S. 668 (1984), and, in turn, warrants an exception to procedural default under *Martinez*.

### B. Statement of Relevant Facts.

All of the facts alleged in the First Amended Petition are incorporated by reference as support for these claims. Grounds II, III, VII(2), VII(3), VII(4), VII(6), and VII(7) are not exhausted. They were not raised at trial or on direct appeal. They were not raised in post-conviction proceedings or on appeal from post-conviction proceedings.

### C. *Martinez v. Ryan* Creates an Exception to Procedural Default for These Claims.

Any procedural default triggered by the failure of state post-conviction counsel to raise the ineffective assistance of trial counsel ("IATC") claims here is excused under *Martinez v. Ryan*, 566 U.S. 1 (2012), which held that an ineffective state post-conviction representation can excuse procedural default of an IATC claim. *See id.* at 7–11. *Martinez* applies to Texas cases such as Petitioner's, where the state habeas proceeding is effectively the first forum to lodge an IATC claim. *See Trevino v. Thaler*, 569 U.S. 413, 417 (2013) (holding that the *Martinez* exception to procedural default applies to the Texas post-conviction scheme). For petitioners whose IATC claims were forfeited by inadequate state post-conviction lawyers, federal habeas proceedings are the only opportunity to enforce the "bedrock" Sixth Amendment guarantee that is the "foundation for our adversary system." *Martinez*, 566 U.S. at 12. A *Martinez* exception for procedural default of an IATC claim requires Petitioner to establish both the cause (that state habeas counsel was ineffective under *Strickland*) and substantiality of the underlying IATC claim (that the claim has "some merit" or is not "wholly without factual support"). *See id.* at 12–16; *see also Norman v. Stephens*, 817 F.3d 226, 232 (5th Cir. 2016) ("To demonstrate that [the underlying claim] is substantial, [petitioner] would have to show that he *might* be able to satisfy [*Strickland*], which requires a prisoner to prove both deficient performance and actual prejudice.") (emphasis in original). Petitioner satisfies both the cause and substantiality elements for excuse of procedural default under *Martinez*.

    1.  <u>Cause</u>: *Post-conviction counsel was ineffective under Strickland v. Washington for failing to raise several ineffective assistance of trial counsel claims.*

        a.  The legal standard for judging ineffective assistance.

Petitioner's right to the effective assistance of counsel is guaranteed by the Sixth and Fourteenth Amendments. U.S. Const. Amend. VI; U.S. Const. Amend. XIV; *McMann v.*

6

*Richardson*, 397 U.S. 759, 771 n. 14 (1970). The two-prong standard for ineffective assistance of counsel claim is set forth in *Strickland v. Washington*, 466 U.S. 668. To establish ineffective assistance of counsel, Petitioner must show that: (1) counsel's performance was deficient; and (2) the deficient performance was prejudicial. *Id.* at 687. A court reviewing an ineffective assistance of counsel claim "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690. Performance is considered deficient if it "fell below an objective standard of reasonableness" based on "prevailing professional norms." *Id.* at 688.

Although "strategic choices made after thorough investigation . . . are virtually unchallengeable," *id.* at 690, the "deference owed such strategic judgments [is defined] in terms of the adequacy of the investigations supporting those judgments." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). Indeed, the "record . . . [may] underscore[] the unreasonableness of counsel's conduct by suggesting that their failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." *Id.* at 526. In reviewing an ineffective assistance of counsel claim, a court should "conduct an assessment of whether [counsel's] decision to cease all investigation . . . actually demonstrated reasonable professional judgment . . . [instead of] merely assum[ing] that the investigation was adequate." *See id.* at 527. Counsel's performance is also deficient if he fails to fully investigate the State's evidence. *Rompilla v. Beard*, 545 U.S. 374, 377 (2005) (finding counsel's performance deficient for failing to examine the file on defendant's prior rape and assault). Finally, "the right to effective assistance of counsel . . . may in a particular case be violated by even an isolated error . . . if that error is sufficiently egregious and prejudicial." *Murray v. Carrier*, 477 U.S. 478, 496 (1986); *United States v. Cronic*, 466 U.S. 648, 657 n. 20 (1984) (same).

These standards apply both to trial counsel and to post-conviction counsel in the *Martinez* inquiry. *See Martinez*, 566 U.S. at 13–16.

Deficient performance has prejudiced the defendant if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

### b.   Post-conviction counsel's performance was deficient.

As set forth with specificity in sections II.C.2.1.iv, II.C.2.2.iii, II.C.2.3.iii, II.C.2.4.iii, and II.C.2.5.iii, *infra*, post-conviction counsel's performance was deficient. Post-conviction counsel's performance was deficient because they failed to raise several IATC claims regarding   trial counsel's (1) failure to challenge the admission of Petitioner's confession as a violation of *Miranda* based on the resumption of interrogation the same day Petitioner invoked both his right to counsel and his right to silence; (2) failure to challenge the truthfulness of the testimony of the State's purported gang expert, the admissibility of his assertions about gangs, and the accuracy of those claims; (3) refusal to permit Petitioner to testify; (4) failure to assert that the Cruel and Unusual Punishment Clause categorically forbids the execution of a nontriggerman who was not present and did not plan or agree to a murder; and (5) failure to present evidence regarding, or retain an expert to evaluate, Petitioner's adaptability to prison. Post-conviction counsel's failure to raise these claims "fell below an objective standard of reasonableness" based on "prevailing professional norms." *Strickland*, 466 U.S. at 688. A thorough reading of the record and proper investigation of the underlying facts would have revealed to post-conviction counsel several additional viable claims, and, in turn, several ways in which trial counsel were ineffective. By failing to do so, post-conviction counsel's performance fell short of the standards imposed by *Strickland* and its progeny. Given the substantiality of the underlying claims' merits, "there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Additionally, nothing in the record indicates that post-conviction counsel's failure to investigate or pursue these claims was a strategic decision. Therefore, because this court should afford post-conviction counsel deference only "in terms of the adequacy of the investigations supporting" their strategic decisions, no deference should be afforded. *See Wiggins*, 539 U.S. at 521.

> c. Post-conviction counsel's deficient performance was prejudicial.

As explained below at sections II.C.2.1.iv, II.C.2.2.iii, II.C.2.3.iii, II.C.2.4.iii, and II.C.2.5.iii, post-conviction counsel's deficient performance was prejudicial to Petitioner. Post-conviction counsel's failure to raise these IATC claims meant that six major instances of trial counsel's ineffectiveness were never presented to the post-conviction court. Necessarily, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Because post-conviction's performance was deficient, and this deficient performance prejudiced Petitioner, post-conviction counsel was ineffective under the *Strickland* standard.

> 2. <u>Substantiality</u>: *The substantiality of the underlying IATC claims have merit and strong factual support.*

As set forth below and in Grounds II, III, VII(2), VII(3), VII(4), VII(6), VII(7), and VII(10) of the First Amended Petition, the substantiality of the underlying IATC claims have merit and strong factual support, such that Petitioner can certainly "show that he *might* be able to satisfy" *Strickland*. *Norman*, 817 F.3d at 232. Petitioner therefore satisfies both the cause and substantiality elements for excuse of procedural default under *Martinez*.

1) **Ground VII(2): Trial Counsel Failed to Challenge the Admission of Petitioner's Confession as a Violation of *Miranda* Based on the Resumption of Interrogation the Same Day Petitioner Invoked Both his Right to Counsel and his Right to Silence.**

     i.    Trial counsel's performance was deficient.

As set forth in Grounds II and VII(2) of the First Amended Petition, the events surrounding Petitioner's statement establish not only that his statement was involuntary, and therefore, a violation of the Due Process Clause of the Fourteenth Amendment, but also that the introduction of his statement at trial violated Petitioner's *Miranda* rights under the Fifth and Fourteenth Amendments. *See* First Am. Pet. at 44–52, 138–39.

*Miranda v. Arizona* requires that a suspect be warned prior to a custodial interrogation of his rights to remain silent and to an attorney, warnings that protect a suspect's privilege against compelled self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 467–68 (1966). When an individual "states that he wants an attorney, the interrogation must cease until an attorney is present." *Id.* at 474. Additionally, "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right" can only be established when "the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). Absent such initiation, police may not interrogate the defendant. *Id.* "Interrogation," within the meaning of *Miranda*, includes all "words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). A police officer's intent is relevant in this regard because "where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was

10

reasonably likely to have that effect." *Id.* at 301 n.7. A suspect's assertion of the right to remain silent must also "be scrupulously honored." *Michigan v. Mosley*, 423 U.S. 96, 103 (1975) (quoting *Miranda*, 384 U.S. at 479).

There is no dispute that Petitioner was in custody at the time he made statements; he was under arrest and detained in jail. Nor is there any dispute that he invoked both his right to an attorney and his right to silence. Therefore, if the ploy using Petitioner's wife either constituted interrogation within the meaning of *Miranda* or failed to scrupulously honor the invocation of his right to remain silent, the introduction of Petitioner's statement at trial violated the Fifth and Fourteenth Amendments to the Constitution.

After Petitioner invoked his rights, Officer Edgar Ruiz told Petitioner's wife that the police knew Petitioner had not been present during the murders, and that if he told the police what he knew, he would be able to go home with his wife and baby. Ruiz then stood behind her while she repeated those promises to Petitioner. It was reasonable for Petitioner to believe Ruiz had given her those assurances—and reasonable for Ruiz to assume that he would believe that. And, when police allowed Petitioner to call his wife—indeed, they even gave him information about how to reach her that he did not have so he could speak to her again—and she repeated Ruiz's promises, then begged him for a second time to tell them what he knew, a reasonable police officer would know that those assurances were reasonably likely to elicit a confession. And they did. While a detached lawyer, familiar with the law of felony murder might well doubt that Petitioner would be released upon telling the police what he knew, a frightened defendant ignorant of the law, faced with a crying wife, and wanting to believe what she said, might well believe it. A lawyer's detachment and expertise are exactly why Petitioner needed the advice of a lawyer, and why, recognizing his own incompetence, he had invoked his right to a lawyer. That Ruiz used

Petitioner's wife to convey his message to Petitioner rather than speak to him directly makes no difference. The government cannot evade constitutional limitations by using a private individual as its agent. *See Corngold v. United States*, 367 F.2d 1, 5 (9th Cir. 1966). Nor can the government claim that a private act is involved when government officers have participated in the act. *See Lustig v. United States*, 338 U.S. 74, 79 (1949). When someone other than a police officer communicates with the defendant, the question is whether the suspect's statement "'resulted from' a calculated 'practice'" on the part of a state agent who was attempting to elicit such a response. *McCrory v. State*, 643 S.W.2d 725, 734 (Tex. Crim. App. 1982) (citing *Innis*, 446 U.S. at 301). Thus, the fact that Petitioner was interrogated within the meaning of *Miranda* by Officer Ruiz's conduct after he invoked his right to an attorney rendered the use of his statements at trial unconstitutional.

Moreover, Petitioner's invocation of his right to remain silent was not scrupulously honored. Of the factors laid out in *Mosley*, only the first factor (that Petitioner was told prior to his first interrogation that he was not obligated to answer questions) weighs in favor of a finding that the police scrupulously honored Petitioner's invocation. All of the rest of the *Mosley* factors, however, weigh against such a finding. First, the time period between Petitioner's invocation of his rights and his interrogation was very short. Second, Officer Ruiz did not remind Petitioner of his *Miranda* rights after bringing his wife in to see him. Third, Petitioner's second interrogation was not restricted to a different crime but was an attempt to get him to speak about the very crime for which he had been arrested and about which he had invoked his right to remain silent. Another relevant factor—whether the suspect was "coerced, threatened, or promised anything for talking with officers," *Maestas v. States*, 987 S.W.2d 59, 64 (Tex. Crim. App. 1999)—also points towards a failure to honor. Lastly, and perhaps most critically, the police could hardly be said to have

"scrupulously honor[ed]" Petitioner's invocation of his right to remain silent when they lied to his wife, promising her that Petitioner would be allowed to go home if he gave them a statement. They told her this lie expecting that she would pass it on to Petitioner and hoping she would urge him to make a statement. This first attempt was immediately only partially successful; Petitioner's wife did repeat the lie and urge Petitioner to tell them what he knew, but he did not immediately do so, and again refused to speak to them. So, they arranged another opportunity for Petitioner's wife to repeat the lie and repeat her pleas. There is no way to describe this series of deceptive, manipulative actions as "scrupulously honor[ing]" Petitioner's invocation of his right to remain silent, because any evidence that the suspect was "threatened, tricked, or cajoled into a waiver" will demonstrate that the defendant did not voluntarily waive his rights. *Miranda*, 384 U.S. at 476. Petitioner was, as described above, both tricked and cajoled into a waiver. Consequently, this "waiver" was not knowing and voluntary. *See Moran v. Burbine*, 475 U.S. 412, 421 (1986).

Trial counsel's failure to assert these claims constitutes deficient performance. Just as trial counsel were ineffective in failing to raise a voluntariness claim based upon the promises to Petitioner's wife, trial counsel were ineffective in failing to assert that those promises, which a police officer made to Petitioner's wife and made it possible for her to convey to him, constituted interrogation within the meaning of *Miranda* and barred the introduction of his statement. It was deficient performance not to do so and given that trial counsel moved to suppress the statement, there is no plausible strategic ground for not asserting far better grounds for its suppression. Respondent has suggested no tactical reason justifying this failure.

      ii.    Trial counsel's deficient performance was prejudicial.

As is discussed at length in the First Amended Petition, the centrality of Petitioner's statement to his conviction of capital murder compels the conclusion that this deficiency prejudiced him. The admission of a confession is virtually never harmless error, for: "A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him . . . .'" *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991). In this case, the State would not have been able to convict Petitioner, let alone sentence him to death, without his confession.

iii.    This claim was not raised at trial.

For a claim to be exhausted and subject to AEDPA's limitations on relief, "a petitioner must have first provided the state's highest court with a fair opportunity to apply (1) the controlling federal constitutional principles to (2) the same factual allegations." *Ruiz v. Quarterman*, 460 F.3d 638, 642 (5th Cir. 2006). "[M]ere similarity of claims is insufficient to exhaust." *Duncan v. Henry*, 513 U.S. 364, 366 (1995).  The Respondent's assertion that this claim was presented to and denied by the state courts is incorrect.

Grounds II & VII(2) argue that trial counsel failed to challenge the admission of Petitioner's confession as a violation of *Miranda* based on the assurances Officer Ruiz provided Petitioner's wife, assurances which he then facilitated her in conveying to Petitioner—after Petitioner had invoked his right to remain silent and his right to consult an attorney. Trial counsel did not raise this claim, nor did they allege or introduce the facts that would support this claim. Trial counsel *did* raise a *Miranda* claim, but it was a different claim: that law enforcement approached Petitioner to obtain a statement from him after he had asserted his rights. Counsel produced no evidence in support of that claim, and the trial court credited testimony proffered by

the State that Petitioner approached law enforcement. However, trial counsel had not investigated the facts that would have given rise to the *Miranda* claim asserted for the first time in this petition, and the trial court made no relevant factual findings and applied no federal constitutional principles to that claim. Thus, the Respondent's assertion "that counsel on direct appeal did raise an *Edwards* claim, which was denied by the TCCA . . . [and that] that decision must also be reviewed under the highly deferential lens of AEDPA," Answer at 27, is inapposite. The necessary premise—that the trial court adjudicated the same claim raised in the First Amended Petition—is false, and therefore, the standard the State urges is the wrong one.

   iv. Post-conviction counsel was ineffective in failing to raise this claim.

  Trial counsel's ineffectiveness in failing to raise these claims is clear; for post-conviction counsel to overlook such ineffectiveness also constitutes deficient performance. Post-conviction counsel *did* contend that trial counsel were ineffective for failing to challenge the admission of Petitioner's confession as involuntary due to promises of leniency, *see* First Am. Pet. at 135–38, and thus, did present the factual basis for the *Miranda* claim, but they did so only in support of an IATC claim for failure to press a voluntariness claim. They failed to raise the related, additional, doctrinally stronger IATC claims surrounding the confession set forth here. There is no possible strategic reason—nor does the State offer one—for post-conviction counsel to assert one IATC claim regarding the confession but not to assert the others. Post-conviction counsel's failure to raise these claims, despite their dependence on the same facts asserted for the IATC confession claim they did plead, must either be the result of a grossly inattentive review of the record or produced by ignorance of the law; in either case, performance is therefore necessarily deficient.

The centrality of Petitioner's statement to his conviction of capital murder compels the conclusion that this deficiency prejudiced him. Therefore, because post-conviction counsel's performance was both deficient and prejudicial, post-conviction counsel is considered ineffective under *Strickland* standards.

      **2)**  **Grounds VII(3): Trial Counsel Failed to Challenge the Truthfulness of the Testimony of the State's Purported Gang Expert, the Admissibility of his Assertions about Gangs, and the Accuracy of those Claims.**

         i.   Trial counsel's performance was deficient.

As set forth in Ground VII(3) of the First Amended Petition, trial counsel failed to challenge the expertise and truthfulness of the testimony of the State's purported gang expert, the admissibility of his assertions about gangs, and the accuracy of those claims. Such failure exacerbated the misleading effects of the withheld evidence. *See* First Am. Pet. at 140. Indeed, trial counsel failed to contest Robert Alvarez's harmful testimony in several viable ways, such as by failing to investigate and challenge his qualifications as a gang expert, *id.* at 140–141; failing to consult and retain an expert to contradict the substance of his testimony, *id.* at 141; failing to object to his inadmissible opinions as to Petitioner's state of mind, *id.* at 142; and failing to object to his improper Spanish translations that permitted him to inaccurately render Petitioner's meaning inculpatory, *id.* at 147–152. Such failure to investigate a critical element of the State's case constituted deficient performance. *See Rompilla v. Beard*, 545 U.S. 374 (2005); *see also, Strickland*, 466 U.S. at 690–91 ("strategic choices made after less than complete investigations are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."); *Wiggins*, 539 U.S. at 521 (same). Such failure "fell below an objective standard of reasonableness" based on "prevailing professional norms." *Strickland*, 466 U.S. at 688. Trial

counsel's performance in this regard was therefore deficient, and post-conviction counsel's failure to raise this source of trial counsel's ineffectiveness was likewise ineffective.

ii.    Trial counsel's performance was prejudicial.

But for trial counsel's failure to investigate Alvarez's qualifications and testimony in previous trials, the trial court would not have qualified him as a gang expert and therefore, he would not have offered flawed expert testimony that misrepresented the methods of operation of a gang and gang membership. If trial counsel had reasonably investigated Alvarez and uncovered his lack of qualifications as a gang expert, Alvarez's testimony about his qualifications would have been impeached and found to be perjurious, and presumably, the trial court would not have qualified him as a gang expert. Even if he had been qualified as an expert witness, if trial counsel had investigated Alvarez's qualifications, he would have been able to impeach Alvarez's truthfulness, and therefore discredit his assertions in the eyes of the jury. Moreover, if trial counsel had investigated the substance of Alvarez's testimony in the trials of Petitioner's co-conspirators, he would have consulted individuals with expertise in gangs; such a consultation would have revealed the inaccuracy of Alvarez's "expert testimony" and permitted him to provide the jury with credible testimony contradicting Alvarez's most damaging assertions. Therefore, there is a reasonable probability that both the result of the guilt-or-innocence phase and the result of the penalty phase would have been different but for trial counsel's failure to investigate Alvarez, object to his inadmissible testimony, and counter his false claims through a witness with true expertise in gangs. *Strickland*, 466 U.S. at 694. Trial counsel's deficient performance was thus prejudicial.

iii.    Post-conviction counsel was ineffective in failing to raise this claim.

Post-conviction counsel's performance was deficient because it "fell below an objective standard of reasonableness" based on "prevailing professional norms" when they failed to fully investigate Alvarez's qualifications, the admissibility of his assertions, and the accuracy of his claims. *Strickland*, 466 U.S. at 688. Counsel has a duty to fully investigate the State's evidence. *See Rompilla v. Beard*, 545 U.S. 374 (2005). There can be no excuse for post-conviction counsel's failure to scrutinize Alvarez—the State's star, expert witness—both as to his qualifications and the accuracy of his testimony. Failure to so investigate cannot be based in any sort of strategic reasoning; here, the "record . . . underscores the unreasonableness of counsel's conduct by suggesting that their failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." *Wiggins*, 539 U.S. at 526. As set forth in more detail in the First Amended Petition, the State relied on Alvarez's testimony on the "green light" and Petitioner's purported "high rank" in the guilt-or-innocence phase to prove that Petitioner should have anticipated the commission of the murders. Post-conviction's deficient performance in this regard was therefore prejudicial because "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Therefore, because post-conviction counsel's performance was both deficient and prejudicial, post-conviction counsel is considered ineffective under *Strickland* standards.

### 3) Ground VII(4): Trial Counsel Refused to Permit Petitioner to Testify, Denying him his Right Under the Fifth Amendment.

#### i.    Trial counsel's performance was deficient.

As set forth in Ground VII(4), Petitioner repeatedly made plain his desire to testify in his own defense. *See* First Am. Pet. at 156–60. Trial counsel abruptly rested without permitting him

to do so, thereby permitting the State to present an exaggerated picture of Petitioner's involvement in the offense.

Petitioner told his trial counsel, Villarreal, of his desire to testify on more than one occasion, and Villarreal appeared to acquiesce telling Petitioner "to get mentally prepared." Sworn Inmate Declaration of Rodolfo Medrano (July 8, 2015) at 2. Petitioner also clearly recalls Mr. Villarreal saying, "it's your life on the line." *Id.* Villarreal did nothing to prepare Petitioner to testify, so Petitioner practiced on his own.

Shortly before the State rested, Villarreal asked Petitioner if he was ready to testify. *Id.* Petitioner was surprised when Villarreal told the judge that the defense rested without calling Petitioner as a witness. *Id.* Second-chair counsel Flores then reassured Medrano to stay calm because "the state had not proven their case." *Id.* Medrano again told his attorneys he wanted to testify and mouthed his confusion to his ex-wife from across the courtroom. *Id.*

Had Petitioner been permitted to testify, he would have given further information regarding some of the things in his statement and would have described his limited role in the gang. Importantly, Petitioner would have testified that he was not part of the planning of the robbery, and that he did not know who was going to be involved. He would have testified that he did not in fact anticipate that anyone was going to be killed that night. Additionally, he would have testified that being a "sergeant" in the gang was not a very high rank, that there was no "green light" mandating that the Tri-City Bombers kill members of the Texas Chicano Brotherhood on sight, that a picture introduced in evidence had no particular significance, that he decided to quit the gang after he spoke to his wife on the phone the night he was arrested, and that he had no disciplinary violations pretrial.

The right to testify is fundamental, *see Rock v. Arkansas*, 483 U.S. 44, 52 (1987), and is personal to the defendant; it cannot be waived by counsel. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983); *see also United States v. Pennycooke*, 65 F.3d 9, 10 (3d Cir. 1995) (reaffirming that only the defendant may waive his right to testify). This is because while many decisions are the province of counsel, "the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." *Jones*, 463 U.S. at 751.

Because the burden is on trial counsel, rather than the court, to ensure a waiver is knowing and voluntary, counsel's failure to respect the defendant's right to testify in his own defense constitutes deficient performance. *United States v. Mullins*, 315 F.3d 449, 454 (5th Cir. 2002). Because the right to testify is personal, deference is not owed to any purported strategic decision to prevent the defendant from testifying when the defendant has evinced a desire to do so to his trial counsel. *See id.* at 453–54. Here, Petitioner voiced his desire to testify on several occasions, and was thwarted from testifying when his trial counsel rested without calling him as a witness.

ii.  Trial counsel's deficient performance was prejudicial.

Trial counsel's deficient performance prejudiced Petitioner in both the guilt-or-innocence and sentencing phases of his trial. In order for the State to convict Petitioner of capital murder, it had to persuade the jury that he anticipated the taking of human life. Petitioner's testimony would have disputed important parts of the State's argument that he had anticipated the taking of human life. His limited rank and role in the gang, his lack of knowledge of who would be involved in the robbery, and his lack of knowledge of any mandate that rival gang members be killed on sight (if in fact there was such a mandate, which seems unlikely), if credited, all would have weighed

heavily against a finding that he should have anticipated the taking of human life. Even if the jury had returned a verdict of capital murder, Petitioner's testimony would have made it reasonably likely that they would have returned with a sentence other than death; his lesser role, lesser knowledge, and his decision to quit the gang would have all decreased his apparent moral culpability and the case for his future dangerousness, as well as dispute that he did in fact anticipate the loss of human life.

iii.     Post-conviction counsel was ineffective in failing to raise this claim.

Post-conviction counsel's performance was deficient for failing to plead trial counsel's deficient performance in denying Petitioner's desire to testify in his own defense. This deficiency did not stem from ignorance of the factual basis of the claim, of which Petitioner informed him, but from ignorance of the law. Post-conviction counsel claimed that trial counsel's refusal to honor Petitioner's right to testify violated the right to testify; however, that claim is appropriate only where the trial court prevents the defendant from testifying. Thus, post-conviction counsel's omission stemmed from ignorance of the law, which is a classic example of deficient performance. No strategic reason could justify choosing the wrong legal vehicle to plead a constitutional violation.

Failing to raise this IATC claim was prejudicial because, as discussed above, had Petitioner been permitted to testify, he would have given further information regarding some of the things in his statement and would have described his limited role in the gang. Therefore, because post-conviction counsel's performance was both deficient and prejudicial, post-conviction counsel is ineffective under *Strickland* standards, and this court must consider the claim on the merits.

**4) Ground VII(6): Trial Counsel Failed to Assert that the Cruel and Unusual Punishment Clause Categorically Forbids the Execution of a Nontriggerman Who Was Not Present and Did Not Plan or Agree to a Murder.**

    i.    Trial counsel's performance was deficient.

As set forth in Ground VII(6) of the First Amended Petition, trial counsel's performance was deficient because they failed to assert that the Cruel and Unusual Punishment Clause of the Eighth Amendment categorically forbids Petitioner's execution because of his minimal involvement. *See* First Am. Pet. at 165–66. Petitioner was charged with supplying guns for a robbery of marijuana. He did not plan the robbery, accompany his co-defendants to the robbery, or discuss or agree to any murder. The State set forth facts which they allege demonstrate that Petitioner "anticipated" the loss of human life. On direct appeal, trial counsel asserted that the State had not satisfied the Eighth Amendment requirements, as set forth in *Enmund v. Florida*, 458 U.S. 782 (1982) and *Tison v. Arizona*, 481 U.S. 137 (1987), but did not claim that the Eighth Amendment categorically bars the execution of a person who was neither at the scene of the crime nor agreed to the killing.

As argued in Grounds IV and V of the First Amended Petition at 90–111 and 111–124, the imposition of the death penalty on such a person is categorically banned. The rarity of cases in which death has been imposed in the absence of both presence and intent should have alerted counsel to the necessity of making such a claim and rendered his failure to do so deficient performance. Trial counsel should have investigated the evolution of law and practice; had he done so, he would have discovered an evolving consensus against the imposition of the death penalty in such cases.

    ii.    Trial counsel's deficient performance was prejudicial.

Had trial counsel both pled the claim and asserted the available data in support of it, there is a reasonable probability that Petitioner's death sentence would have been overturned, either on appeal or on petition to the Supreme Court of the United States.

    iii. Post-conviction counsel was ineffective in failing to raise this claim.

Post-conviction counsel's performance was deficient for overlooking the fact that trial counsel failed to assert that the Cruel and Unusual Punishment Clause categorically forbids the execution of a nontriggerman who was not present and did not plan or agree to a murder. This deficient performance prejudiced Petitioner. Therefore, because post-conviction counsel's performance was both deficient and prejudicial, post-conviction counsel is ineffective under *Strickland* standards, and this IATC claim must be evaluated on the merits.

  **5) Ground VII(7): Trial Counsel Failed  to Present Evidence Regarding or Retain an Expert to Evaluate Petitioner's Adaptability to Prison.**

    i. Trial counsel's performance was deficient.

As set forth in Ground VII(7) of the First Amended Petition, trial counsel failed to present evidence regarding, or to retain an expert to evaluate Petitioner's adaptability to prison. *See* First Am. Pet. at 167–71. The State argued that Petitioner's gang affiliation made him likely to be dangerous in the future. Tr. Vol. 47 at 133–35. Detective Alvarez insinuated during his testimony that Petitioner would remain a gang member in prison. *See* Tr. Vol. 44 at 66–67 ("You left county jail and you went to prison, you stayed a Tri City Bomber"). Trial counsel did virtually nothing to counter this argument. Although counsel did call some witnesses to say that Petitioner had changed, and that he had left the gang, those witnesses had little credibility, for they had only

known Petitioner a short time, were merely reporting what he had told them, and had no relevant expertise. Tr. Vol. 47 at 72–118.

Trial counsel also could have presented testimony from guards as to Petitioner's jail behavior, which would have been more credible than the lay evidence he did present, *see, e.g.*, Tr. Vol. 47 at 72–75, and he could have presented testimony from Joaquin "Jack" Alaniz, an officer with personal knowledge of the steps Petitioner had taken to leave the gang. However, counsel presented neither.

At the sentencing phase of trial, the jurors' discretion to impose a life sentence or the death penalty is guided by the requirement that they identify and consider aggravating and mitigating circumstances and derive their verdict from their considerations.

"[E]vidence . . . of a defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is . . . by its nature relevant to the sentencing determination." *Tennard v. Dretke*, 542 U.S. 274, 285 (2004) (quoting *Skipper v. South Carolina*, 476 U.S. 1, 7 (1986)). Although inferences from a defendant's adaptability to confinement do not "relate specifically to [the defendant's] culpability for the crime he committed, there is no question that such inferences would be 'mitigating' in the sense that they might serve 'as a basis for a sentence less than death.'" *Skipper*, 476 U.S. at 4–5 (internal citations omitted). Just as evidence that a defendant would pose a danger to the community in the future if he were not executed may be treated as establishing an "aggravating factor" for purposes of capital sentencing, evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating. *Id.*

      ii.    Trial counsel's deficient performance was prejudicial.

Evidence of adaptability to confinement would have been particularly important in this case. In every Texas case, such evidence assumes heightened importance because imposition of the death penalty requires a jury determination that the defendant is likely to be dangerous in the future. *See Jurek v. Texas*, 428 U.S. 262, 268–69 (1976); *see also* Tex. Code Crim. Proc. art. 37.071 (2017). Therefore, evidence tending to show adaptability to prison challenges the State's evidence of death eligibility and provides a mitigating factor for the jury to consider. *See Skipper*, 476 U.S. at 7. But adaptability to confinement evidence would have been particularly critical in this case, where the jury's impression from the testimony about Petitioner's gang membership would have created a strong impression—indeed, likely a *fear*—that he would be very dangerous in the future. An expert, however, would have countered that impression.

An adaptability to confinement expert (also referred to as "a prison adaptability expert"), relying upon base rates of recidivism and Petitioner's spotless pretrial incarceration record, as well as his social history and lack of prior incarcerations, would have told a jury that Petitioner was very unlikely to commit a violent offense while incarcerated, and if ultimately released, extremely unlikely to reoffend. In fact, such a prediction would have been correct. Since Petitioner's sentencing, he has only had three disciplinary infractions, all for extremely minor incidents: one for possession of glue, one for possession of a magazine, and one for possession of a fishing line (used to pass a magazine between cells). An expert would have testified that Petitioner's perfect pretrial jail behavior was a far better predictor of the likelihood that he would commit violence while incarcerated than was his behavior on the street. An expert would have testified that Petitioner's lack of prior incarcerations decreased the likelihood of his recidivism as compared to defendants who had previously been incarcerated. An expert would have testified that the Texas

25

prison system has a program that facilitates leaving a gang and offers protection for inmates who do so.

Presentation of an adaptive confinement expert would have supported the (very limited) punishment phase strategy trial counsel embraced. Because no strategic reason weighed against presentation of adaptability to confinement evidence, *cf. Sims v. Brown*, 425 F.3d 560, 586 (9th Cir. 2005) (finding no deficient performance because the optimistic assessment of the adaptability expert proffered by post-conviction counsel "would have been severely undercut by [the defendant's] bad conduct discharge from the Army for a crime that involved the use of force or violence and which would have been admissible as aggravating evidence during the penalty phase."), trial counsel's failure to investigate and present such evidence constituted deficient performance. Because a death sentence under Texas law requires a finding of future dangerousness, because the State's contention that Petitioner would be dangerous in the future could have been countered by evidence of his adaptability to confinement, and because such evidence would have been mitigating, but for counsel's deficient performance, there was a reasonable probability that Petitioner would not have been sentenced to death.

iii.   Post-conviction counsel was ineffective in failing to raise this claim.

Post-conviction counsel's performance was deficient because it "fell below an objective standard of reasonableness" based on "prevailing professional norms" when they failed to raise an IATC claim based on trial counsel's failure to present evidence regarding or retain an expert to evaluate Petitioner's adaptability to prison. As discussed, trial counsel had no strategic reason not to present evidence of adaptability to confinement; in turn, post-conviction counsel had no reason not to assert this IATC claim. An attentive review of the record would have revealed trial counsel's

inadequacy to post-conviction counsel. Had post-conviction counsel raised this claim, there is a reasonable probability that the state habeas court would have reversed Petitioner's death sentence and that upon resentencing, Petitioner would not have been sentenced to death. Therefore, because post-conviction counsel's performance was both deficient and prejudicial, post-conviction counsel is considered ineffective under *Strickland*.

Should this Court determine that Petitioner's allegations and evidence regarding cause and prejudice with respect to his default of any of the above-discussed IATC claims are insufficient to clearly establish them, he moves for, and as discussed below, is entitled to, a hearing on those allegations to enable him to present additional evidence.

## III.   PETITIONER MOVES FOR AND IS ENTITLED TO AN EVIDENTIARY HEARING UNLESS THIS COURT DETERMINES THAT THE PLEADINGS ARE SUFFICIENT TO GRANT RELIEF

The decision to grant an evidentiary hearing on the merits of a claim for habeas corpus relief is governed by a combination of Supreme Court precedent and statute. Pursuant to *Townsend v. Sain*, 372 U.S. 293 (1963), "where an applicant for a writ of habeas corpus alleges facts which, if proved, would entitle him to relief, the federal court . . . has the power to receive evidence and try the facts anew." *Townsend*, 372 U.S. 293; *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). That "power," however, is limited by 28 U.S.C. § 2254(e)(2), which generally forbids a federal evidentiary hearing "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings . . . ." *See also Williams v. Taylor*, 529 U.S. 420, 430 (2000). Diligence under § 2254(e) "depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend . . . upon whether or not those efforts could have been successful." *Williams*, 529 U.S. at 435; *see also*, *e.g.*, *McDonald v. Johnson*, 139 F.3d 1056, 1059 (5th Cir. 1998).

Where proposed fact development does not concern the merits "of a claim" for relief, §
2254(e)(2), but is instead addressed to the petitioner's ability to overcome a procedural bar via a
showing of "cause and prejudice," § 2254(e)(2)'s restriction does not apply. *See, e.g.*, *Vineyard v.
Dretke*, 2005 WL 590432 at *2–3 (5th Cir. Mar. 14, 2005) (per curiam) (citing *Cristin v. Brennan*,
281 F.3d 404, 412–13 (3rd Cir.2002)) (noting that § 2254(e)(2) "does not appear to address
scenarios like the one in the instant case, in which the factual dispute concerns not a substantive
constitutional claim but the federal court's application of a nonconstitutional rule."); *Rodney v.
Filson*, 916 F.3d 1254 (9th Cir. 2019) ("[Section] 2254(e)(2) does not bar the district court from
holding an evidentiary hearing, because a petitioner seeking to show cause based on a lack of post-
conviction counsel is "not asserting a 'claim' for relief as that term is used in § 2254(e)(2).").

Here, unless this Court finds (as argued above) that the pleadings themselves establish
cause and prejudice under *Martinez*, Petitioner is entitled to present further evidence that state
habeas counsel's performance was deficient, and that the deficiency prejudiced Petitioner.
Likewise, Petitioner has alleged that the State continued throughout post-conviction proceedings
to conceal the perjury of police officer Alvarez, and Petitioner is entitled to an evidentiary hearing
to establish cause and prejudice excusing his default of his Brady claim—unless this Court deems
the evidence of cause and prejudice already before it sufficient to excuse any default.

Moreover, "[w]here there is a factual dispute, that if resolved in the petitioner's favor,
would entitle him to relief and the State has not afforded the petitioner a full and fair evidentiary
hearing, a federal habeas corpus prisoner is entitled to discovery and an evidentiary hearing."
*Goodwin v. Johnson*, 132 F.3d 162, 178 (5th Cir. 1997). Further, it is an abuse of discretion not to
hold an evidentiary hearing where the district court lacks sufficient undisputed facts to make an
informed decision. *See Barrientes v. Johnson*, 221 F.3d 741, 770 (5th Cir. 2000). As discussed

below, the state court factual determinations related to the voluntariness of Petitioner's confession, his right to testify, and his culpability for a homicide he did not intend, did not participate in, and was not present for, were unreasonable and unsupported by the record, particularly given the lack of a state court evidentiary hearing.

## IV.   CONSIDERATION OF THE ADDITIONAL EVIDENCE PROFFERED IN THE FIRST AMENDED PETITION IS NOT PRECLUDED BY 28 U.S.C. § 2254(e).

Respondent objects that Petitioner's claims depend upon evidence not introduced in state court, and consequently barred by 28 U.S.C. § 2254(e). This contention is wrong.  With respect to his exhausted claims, as discussed below, many of the state court's critical factual determinations were unreasonable. (28 U.S.C. § 2254(e) *would* bar consideration of any new evidence to demonstrate that the state court's factual determination was unreasonable, but in no instance does Petitioner's argument that the state court determination was unreasonable depend upon evidence not before the state court.) Under these circumstances, AEDPA does not preclude relief, and a federal court may consider additional evidence for a variety of purposes, including whether it should hold an evidentiary hearing. With respect to claims not presented to the state courts, a federal court will need to consider evidence not presented to the state court to determine whether there may be an available state court remedy requiring the issuance of a *Rhines* stay, and/or whether the Petitioner has established cause and prejudice for a procedural default.[2]

---

[2] Respondent also argues that Petitioner is wrong to attack the reasoning of the state habeas trial court because it is the decision of the TCCA that governs, and the TCCA may have had its own reasons for denying a claim. However, given that the TCCA gave *no* reasons for its denial of any of Petitioner's claims, all that Petitioner can do is respond to reasoning of the state habeas trial court and the arguments made by Respondent. Notably, the dissents in the TCCA point out that the trial court's findings lacked support in the record— but the TCCA majority did not offer either a defense of those findings or an alternative basis for denying the claims.

## RESPONDENT'S ARGUMENTS REGARDING THE MERITS AND § 2254(d)

I.      **GROUND I: PETITIONER'S STATEMENT WAS NOT VOLUNTARY; IT WAS OBTAINED IN EXCHANGE OF PROMISES OF LENIENCY IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

### A.  Summary of the Claim

The admission of an involuntary confession violates a defendant's Fifth Amendment right against self-incrimination. *Bram v. United States*, 168 U.S. 532, 542 (1897). Whether a confession is voluntary depends upon the totality of the circumstances. *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963). This includes the use of psychological ploys, *see Spano v. New York*, 360 U.S. 315, 321–24 (1959), or the inducement of a statement with promises, *see Lynumn*, 372 U.S. at 532–35.

Here, Petitioner's statement to the police confessing his role in the robbery was rendered involuntarily because Officer Ruiz elicited the confession with a promise of leniency. After Petitioner invoked his *Miranda* rights, Officer Ruiz told Petitioner's wife, Juana Garces, that Petitioner could go home if he told the police what he knew. Officer Ruiz then arranged for Juana to meet with Petitioner and convey this message. Later that day, Officer Ruiz facilitated a phone call between Petitioner and Juana, in which Juana repeated her plea and Officer Ruiz's promise. After that call, Petitioner confessed.[3]

The TCCA denied this claim in state post-conviction proceedings. State post-conviction counsel had introduced the affidavit of Juana Garces—now Petitioner's *former* wife—in support

---

[3] The factual basis for this claim, including the Edinburg Police Department's systematic use of a defendant's family member to extract a confession after the defendant asserted his *Miranda* rights, is set forth in more detail in First Am. Pet. at 22–32. This court should find that on the record before the state court, the only reasonable determination of facts based on an application of established constitutional law is that Petitioner was denied the effective assistance of counsel by his counsel's failure to raise a voluntariness claim, and should simply grant the writ of habeas corpus. Alternatively, it could grant an evidentiary hearing at which Petitioner would present additional evidence relevant to this claim, including evidence that the tactics used by Officer Ruiz were part of a pattern of police misconduct designed to evade detection of constitutional violations.

of the claim that trial counsel were ineffective for failing to produce evidence that Petitioner's confession was rendered involuntarily. Br. of Appellant at 94, *Ex parte Medrano*, 532 S.W.3d 395 (Tex. Crim. App. 2017). The State had every opportunity to introduce evidence disputing Ms. Garces's account, or disparaging her credibility,[4] but elected not do so. Despite the fact that no evidence contradicting or impeaching the Garces affidavit was introduced in post-conviction proceedings, despite the fact that nothing in the trial record contradicts that account, and without the benefit of an evidentiary hearing that might have produced additional evidence, the hearing court discredited Ms. Garces's affidavit, and the TCCA, after its own review of the record, did the same, and affirmed that denial. *Ex parte Medrano*, 532 S.W.3d at 395.

### B.   AEDPA Does Not Preclude Relief on This Claim Because the TCCA's Denial of Relief Rested on an Unreasonable Determination of Facts and/or an Unreasonable Application of Federal Law as Established by the Supreme Court.

Respondent asserts that Petitioner fails to overcome his burden because while the First Amended Petition argues that the trial court's findings of facts and conclusions of law were unreasonable, the TCCA did not adopt those findings and Petitioner failed to "make any arguments why the TCCA's decision itself was unreasonable . . . ." Answer at 27.  However, while the TCCA opinion states that it "has reviewed the applicant's allegations and denies relief on those allegations based upon our own review of the record," *Ex parte Medrano*, 532 S.W.3d 395 (Tex. Crim. App. 2017), it gave absolutely no reasons for its denial. Perhaps the TCCA made its own factual determination. But whether or not the TCCA implicitly adopted the trial court's factual findings, or made its own unarticulated determination of the facts, is irrelevant because any determination

---

[4] Ms. Garces has no criminal record and is employed in an attorney's office. There is no basis in the record, nor is undersigned counsel aware of any basis not in the record, for deeming her untruthful or unreliable.

of the facts that would warrant denial of the claim is unreasonable for the very same reason as was the post-conviction court's: the record cannot support such a determination.

Any decision to deem the Garces affidavit false constitutes an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Garces affidavit, if believed, provides a factual basis for finding Petitioner's confession involuntary, and for finding trial counsel's failure to raise the involuntariness of his confession ineffective. No evidence—in the trial record or the state habeas record—contradicted Ms. Garces's account of the events that induced Petitioner's confession. Of course, had the state habeas court held a hearing, any observations it made regarding her demeanor or any impeachment through cross-examination might have been part of the factual determination. That, along with any contrary testimony introduced by the State, conceivably could have supported the state trial and appellate court findings. But no such hearing took place, and consequently, there was no *reasonable* basis for finding her affidavit to be false. Indeed, only two reasons have ever been suggested for finding it false: that Ms. Garces "ha[d] a clearly biased view of what occurred," and that her claim that Officer Ruiz told her Petitioner "could go home with her if he told the police what he knew is 'clearly not credible.'" FF&CL at 463, ¶¶ 112–13. That Ms. Garces previously was married to Petitioner cannot, standing alone, be a reason to deem her a liar and any affidavit she signs perjurious. Neither law nor life support such a sweeping disqualification based on marriage (or former marital status).

Respondent also suggests that the officer never would have made such a promise because it was not in his power to deliver. But that is completely beside the point; if, as Petitioner alleges, Officer Ruiz made the assurances described in the Garces affidavit, he did not make them with plans to keep them but with the goal of inducing a confession. If, on the contrary, Officer Ruiz did

*not* make those assurances or provide the opportunities for Ms. Garces to repeat those assurances, then the State should have introduced Ruiz's testimony or affidavit denying Petitioner's allegations. Yet it chose not to do so. Nonetheless, the TCCA not only denied this claim despite the absence of *any* contrary evidence, but did so in the absence of an evidentiary hearing. Four judges dissented from the TCCA's denial of relief, objecting that the trial court should have held an evidentiary hearing to resolve disputed issues. *Ex parte Medrano*, 532 S.W.3d at 395–98 (Alcala, J., dissenting) (Petitioner was entitled to an evidentiary hearing on his voluntariness, right to testify and *Tison* claims); *id.* at 398–400 (Richardson, J., dissenting) (Petitioner was entitled to an evidentiary hearing in part because many of the findings of the lower court were erroneous or lack support in the record).

Because the TCCA denied a claim when there was uncontradicted evidence in support of that claim and no basis in the record for discrediting that evidence, this adjudication necessarily relied upon an unreasonable determination of facts under 28 U.S.C. § 2254(d)(2)—assuming it relied upon a factual determination at all. The only alternative explanation for the TCCA's unexplained denial of this claim is that it deemed the factual allegations insufficient, even if credited, to require relief. Such a decision, however, would be "contrary to, or involve[] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). That law is set forth in detail in the First Amended Petition. In either case, AEDPA does not preclude relief.

This court should grant Petitioner a new trial based upon the uncontroverted evidence. Alternatively, it could grant an evidentiary hearing to fully develop the record, adopting the reasoning of the dissent that "the substance of the allegations with respect to police inducement have never been litigated . . . ." *Id.* at 397 (Alcala, J., dissenting).

**II.**     **GROUND II: PETITIONER'S RIGHT TO AN ATTORNEY AND RIGHT TO REMAIN SILENT GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE INFRINGED BY THE ADMISSION OF A STATEMENT OBTAINED THROUGH INTERROGATION AFTER PETITIONER INVOKED HIS RIGHT TO COUNSEL AND POLICE FAILED TO SCRUPULOUSLY HONOR HIS RIGHT TO REMAIN SILENT.**

### A.  Summary of the Claim

*Miranda v. Arizona* mandates that if a defendant asserts his right to counsel, the interrogation must cease until an attorney is present. 384 U.S. 436, 474 (1996). "Interrogation," within the meaning of *Miranda*, includes all "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). *Miranda* also protects an assertion of the right to remain silent. "A reasonable and faithful interpretation of the *Miranda* opinion must rest on the intention of the Court in that case to adopt fully effective means . . . to notify the person of his right to silence and to assure that the exercise of the right will be scrupulously honored . . . ." *Michigan v. Mosley*, 423 U.S. 96, 103 (1975) (quoting *Miranda*, 384 U.S. at 479).

A suspect may waive the rights conveyed in the *Miranda* warnings, but must do so "knowingly and voluntarily." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). Determining whether a waiver was knowing and voluntary requires a two-part inquiry into the "totality of the circumstances surrounding the interrogation." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Any evidence that the suspect was "threatened, tricked, or cajoled into a waiver" will demonstrate that the defendant did not voluntarily waive his rights. *Miranda*, 384 U.S. at 476.

Here, after Petitioner asserted his *Miranda* rights, Officer Ruiz violated Petitioner's invoked rights when he used Petitioner's wife to convey the promise of leniency that ultimately

34

induced Petitioner to confess.[5] Officer Ruiz's promise, conveyed through Petitioner's wife, was interrogation within the meaning of *Miranda* because Office Ruiz knew or should have known it was reasonably likely to elicit an incriminating response from the suspect (as it in fact did) and thus was impermissible because Petitioner had requested an attorney. Moreover, Officer Ruiz's actions, made after Petitioner invoked his right to remain silent, failed to "scrupulously honor" that invocation.

### B. The TCCA Did Not Adjudicate Petitioner's *Miranda/Edwards* Claim

Respondent contends that the TCCA's denial of Petitioner's *Edwards* claim on direct appeal is owed deference. Answer at 27. After quoting excerpts of this opinion, Respondent states that the "TCCA properly identified the established law and reasonably applied that law to the facts as it was presented." *Id.* at 32.

Respondent's lengthy description of the TCCA's direct appeal opinion misses the point. The *Miranda/Edwards* claim that was adjudicated on direct appeal is not the one Petitioner presented in his Petition to this Court. The TCCA ruled that the State did not violate *Miranda* because Petitioner waived his rights when he initiated a conversation with Officer Ramirez. *Medrano v. State*, 2008 WL 5050076 at *19–21; this disposed of trial counsel's claim that Ramirez initiated contact. The claim presented here, however, is different. It depends on the fact that *after* Petitioner asserted his *Miranda* rights and *before* any contact between Petitioner and Officer Ramirez took place, the State violated Petitioner's right to an attorney and failed to scrupulously honor Petitioner's right to remain silent; the Miranda violation occurred when Officer Ruiz employed Petitioner's wife to convey a promise designed to induce a confession. The TCCA direct

---

[5] The factual basis for this claim is set forth in more detail in First Am. Pet. at 22–32.

opinion did not and could not discuss these grounds for a *Miranda/Edwards* violation because it had not been presented with them. That both the claim pressed on direct appeal and the claim pleaded in the First Amended Petition may be denominated "Miranda" claims does not change that they are different claims, claims that depend upon different facts and different legal theories.

### C. Petitioner Did Not Validly Waive His *Miranda* Rights

Respondent also urges that Petitioner waived his *Miranda* rights after asserting them. *See* Answer at 32 ("The credible evidence demonstrates that Medrano understood and voluntarily waived his rights and that his confession was not coerced or otherwise involuntary.") But Petitioner was tricked and cajoled into a waiver when Juana twice conveyed Officer Ruiz's false promise of leniency, promises that themselves, given Petitioner's prior invocation of his rights, violated *Miranda*.

Respondent argues that Petitioner revoked his *Miranda* rights when he initiated contact with Ramirez and then signed a written waiver. Answer at 31–32 (quoting *Medrano*, 2008 WL 5050076 at *19–21) (citing *Cross v. State*, 144 S.W.3d 521, 526 (Tex. Crim. App. 2004)) ("A suspect, however, can waive his previously invoked right to counsel if: (1) the suspect himself initiates further communication with the authorities after invoking the right to counsel; and, (2) after he reinitiates communication with the authorities, the suspect validly waives the right to counsel.") (internal citations omitted). Assuming—as the trial court found—that Petitioner initiated communication with Officer Ramirez, he did so *after* Ruiz resumed interrogation by using Petitioner's wife to convey a promise of leniency.[6] Respondent's convenient omission of what *preceded* Petitioner's "waiver" produces circular logic: if a waiver obtained after a *Miranda*

---

[6] Moreover, any purported waiver was one produced by a trick, thus rendering his waiver not knowing and voluntary. *Moran*, 475 U.S. at 421.

violation is nonetheless dispositive evidence that the defendant voluntarily waived his *Miranda* rights, then virtually no defendant would ever be able to prove a *Miranda* violation. This is precisely why *Moran v. Burbine* demands inquiring into the "totality of the circumstances surrounding the interrogation." *Moran*, 475 U.S. at 421. It is also why invocation of the right to counsel requires that interrogation cease, and invocation of the right to silence requires that it be scrupulously honored.

Further, in arguing that the State did not impermissibly interrogate Petitioner and that this case is like *Arizona v. Mauro*, Respondent mischaracterizes the encounter between Ms. Garces and Officer Ruiz:

> The first alleged conversation took place only after Juana asked to talk her [sic] husband. The officer's response, according to Juana, was "let me see what I can do." Law enforcement did not convey a promise to Juana and then send her in specifically to convey that promise. Rather, like the case Medrano cites in his amended petition, Juana was allowed to speak to Medrano at her request. *See* ECF 19 at 50; *Arizona v. Mauro*, 481 U.S. 520, 523–24 (1987). This was not an interrogation by an agent of law enforcement under any reasonable legal theory.

Answer at 32–33 (internal citations omitted).

This argument too omits a crucial event. Officer Ruiz conveyed a promise to Ms. Garces when he told her that if Petitioner told the police what he knew, Petitioner would be able to go home to his wife and baby. *See* First Am. Pet. at 35. As much as Respondent argues that their exchange was not a promise, Officer Ruiz told Ms. Garces precisely what the State would do—let Petitioner go home to his wife and baby—if Petitioner confessed.[7] The interrogation within the

---

[7] *See* Promise, MERRIAM–WEBSTER, https://www.merriam-webster.com/dictionary/promise (last visited Sept. 12, 2019) (defining promise as "a declaration that one will do or refrain from doing something specified.")

meaning of *Miranda* then took place when, after Petitioner had invoked his right to an attorney, Ms. Garces relayed this promise to Petitioner under circumstances facilitated by Officer Ruiz. *See* First Am. Pet. at 47–51.

The argument that Petitioner was not interrogated because his wife talked to him at her request is also unpersuasive. *See id.* at 49–51. The point is not who requested the contact, but who supplied the assurance that was conveyed during that contact. Officer Ruiz transformed the encounter into an interrogation by using Petitioner's wife to convey an inducement to confess. Officer Ruiz employed a police practice designed to elicit an incriminating response, which he should have known was reasonably likely to produce that effect. *Innis*, 446 U.S. at 301. Respondent fails to address Petitioner's instructive comparison to *Innis*, First Am. Pet. at 47–48, and instead omits part of the conversation between Officer Ruiz and Petitioner's then-wife and offers the conclusory statement that "[t]his was not an interrogation by an agent of law enforcement under any reasonable legal theory." Answer at 33.

Further, in comparing this case to *Arizona v. Mauro*, Respondent ignores a dispositive distinction. True, in both cases the wife requested to talk to the defendant. But in *Mauro*, the police neither facilitated the encounter as a way of avoiding the dictates of *Miranda*, nor supplied her with information designed to prompt a confession. *Arizona v. Mauro*, 481 U.S. 520, 524 (1987). Indeed, the police did not want Mauro's wife to talk to her husband but yielded to her insistent demands. *Id.* at 523–24. In contrast, Officer Ruiz gave Petitioner's wife the message he wanted her to convey to Petitioner, and arranged two occasions for her to convey it.

To the extent Respondent is asserting that Petitioner's rights were not violated because he initiated contact with Officer Ramirez hours after the promise was last conveyed to him, Answer at 33, it is unclear what the significance of this interval could be. The relevant *Mosley* factor in

ascertaining whether Petitioner's right to remain silent was "scrupulously honored" is the time period between the defendant's assertion of his rights and the State's resumption of the interrogation, not the time period between the delivery of the promise and the resultant confession. *Mosley*, 423 U.S. at 104; *see* First Am. Pet. at 51. If Respondent means that the assurances conveyed by Petitioner's wife did not in fact prompt the confession, it is important to observe that in *every* case, it could be speculated that interrogation did not prompt the confession, but that something else did. But Respondent does not suggest what that something else might have been in this case, where prior to the assurances, Petitioner did not want to speak to law enforcement without a lawyer, nor does Respondent point to law that makes such sheer speculation about other possible motivations relevant.

Relatedly, Respondent argues that there was no induced confession because "Medrano never refers to, or even alludes to some understanding between himself and law enforcement, or even mentions his hope of lenience by providing a statement." Answer at 33. Respondent fails to support with any authority the proposition that such a reference is necessary or even relevant. Instead, the relevant questions are whether Petitioner was interrogated—which is judged by whether what the officer did was reasonably likely to elicit an incriminating response—and whether law enforcement scrupulously honored his invocation of rights. It is indisputable that Petitioner got nothing for his cooperation, but what that demonstrates is only that he really did need the lawyer he requested, not that his request was honored.[8]

---

[8] A footnote in Respondent's Answer contains a last-ditch argument: "Further, [the second promise] came hours after the first alleged promise was made. Therefore, it would be unreasonable for law enforcement to think, and a court to find, a telephone reiteration of the same promise would be likely to induce a confession, when a tearful plea in person was not effective in doing so." Answer at 33 n.10. But this both ignores the cumulative effect of a twice-repeated promise, and the possibility that a telephone conversation might be more effective than an in-person plea, given that Petitioner would have been alone at the jail for the second, and aware that time alone had not brought about his release. In any event, Ruiz clearly thought it was worth a second shot, and that second shot paid off.

**D.  Petitioner Is Not Seeking an Expansion of Constitutional Law in Violation of *Teague v. Lane* Because *Miranda* and its Progeny Already Compel the Outcome in This Case**

Respondent argues that because Petitioner "cites to no established rule of constitutional law that equates interrogation to statements made to a prisoner by a loved one, either in person or by telephone," he is "asking this Court to impermissibly extend all law relating to Miranda and interrogations past any reasonable interpretation of existing precedent and to create a new right." Answer at 35. Respondent's argument must fail because *Miranda* and its progeny directly compel the outcome sought by Petitioner.

Petitioner does not have to cite to an established rule of constitutional law "that equates interrogation to statements made to a prisoner by a loved one," *id.*, any more than he would have to show that the wording of the promise made to him exactly matched the promise in a Supreme Court case. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003) ("In other words, a federal court may grant relief when a state court has misapplied a 'governing legal principle' to 'a set of facts different from those of the case in which the principle was announced.'"). What matters is that an established rule of constitutional law defines interrogation as "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301. That law, established by the Supreme Court almost forty years ago, governs this case. That Officer Ruiz used Petitioner's wife to convey his message to Petitioner rather than speak to him directly could make no difference, unless it drastically altered the likelihood of an incriminating response— which it did not. The government cannot evade constitutional limitations by using a private individual as its agent. *See Corngold v. United States*, 367 F.2d 1, 5 (9th Cir. 1966). Nor can the government claim that a private act is involved when government officers have participated in the

act. *See Lustig v. United States*, 338 U.S. 74, 79 (1949). When someone other than a police officer communicates with the defendant, the question is whether the suspect's statement "'resulted from' a calculated 'practice'" on the part of a state agent who was attempting to elicit such a response. *McCrory v. State*, 643 S.W.2d 725, 734 (Tex. Crim. App. 1982) (citing *Innis*, 446 U.S. at 301).

When Officer Ruiz told Petitioner's wife that the police knew Petitioner had not been present during the murders, and that if he told the police what he knew, he would be able to go home with his wife and baby, and Ruiz then stood behind her while Petitioner's wife repeated those promises to Petitioner, Ruiz knew or should have known that Petitioner would believe Ruiz had given her those assurances. And when police allowed Petitioner to call his wife—indeed, even gave him information he did not have about how to reach her so he could speak to her again—and she repeated Officer Ruiz's promises, then begged him for a second time to tell them what he knew, those words and actions taken together were reasonably likely to elicit an incriminating response. And they did.

Respondent also suggests that Petitioner was not interrogated because the State never introduced evidence of what Petitioner told his wife after she relayed the promises. Answer at 35. Whatever Petitioner did or did not tell his wife, the "incriminating response" that was reasonably likely—and introduced against Petitioner—was his statement to the police.

Respondent is therefore wrong in arguing that the *Teague* bar applies, because relief in this case does not require application of any "rules of constitutional law that have yet to be announced, or that were announced after [Petitioner's] conviction became final." Answer at 33 (citing *Teague v. Lane*, 489 U.S. 288, 309–10 (1989)).

**III.    GROUND III: THE STATE VIOLATED PETITIONER'S RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION WHEN IT**

WITHHELD *BRADY* EVIDENCE THAT WOULD HAVE IMPEACHED PURPORTED GANG EXPERT DETECTIVE ROBERT ALVAREZ'S FALSE TESTIMONY AS TO HIS QUALIFICATIONS AND AS TO ITS SUBSTANCE.

### A.  Summary of the Claim

The State violated Petitioner's due process rights when it failed to disclose evidence about Detective Robert Alvarez's perjured testimony about his qualifications as a gang expert, and false and inaccurate testimony about gang membership, gang identification, and the modus operandi of gangs.[9] All the suppressed evidence was favorable to Petitioner and material to both guilt and sentencing. *See* First Am. Pet. at 86–90.

### B.  The State Suppressed *Brady* Evidence About Robert Alvarez's Qualifications

Respondent's Answer denies that the State suppressed any evidence regarding Alvarez's qualifications:

> Many of the factual bases Medrano now claims the State failed to disclose were taken from Alvarez's curriculum vitae, job application, personnel file, and TCOLE records, all of which existed well before Medrano's trial. . . . [T]here was nothing preventing counsel from requesting access to this information and discovering the "discrepancies" himself. *Kutzner v. Cockrell*, 303 F.3d 333 (5th Cir. 2002) (holding that *Brady* does not obligate the State to supply the defense with exculpatory evidence that is fully available to the defendant through the exercise of reasonable diligence).

Answer at 50.

But counsel *did* request access to this information. Trial counsel filed the following discovery motions: Motion for Discovery Production (filed May 20, 2003); Motion for Voir Dire of Expert Witnesses (filed May 20, 2003); Motion for Production of Evidence for Expert Evaluation (filed May 20, 2003); Motion for Production of Evidence Favorable to the Accused

---

[9] The factual basis for this claim is set forth in detail in First Am. Pet. at 53–82.

(filed May 20, 2003); Motion for Discovery of Exculpatory and Mitigating Evidence (filed May 20, 2003); Specific Brady, Kyles, and Whitley Requests (filed August 08, 2005). The State did not respond to any of them.

Moreover, Respondent's reliance on *Kutzner* is inapposite in two significant ways. *Kutzner* held there was no suppression where, although the allegedly exculpatory DNA evidence had been disclosed to the defense before trial and discussed at trial during a cross examination, the defense counsel never requested its testing. *Kutzner*, 303 F.3d at 336. Here, however, the State failed to disclose the existence of the evidence to the defense before or during trial, and the State failed to respond to defense counsel's repeated discovery motions seeking this information.

### C. The State Suppressed Brady Evidence About the Substance of Alvarez's Testimony

Respondent argues that the State did not suppress *Brady* evidence that the substance of Alvarez's testimony was false. Answer at 50–51. Respondent claims that even if the substance of the testimony was false, there is no evidence that Alvarez knew that it was. Answer at 51 ("Other than a conclusory statement Medrano fails to even address whether the knowledge he is imputing to the State was in fact possessed by Alvarez. . . . [T]here is no evidence to show that Alvarez himself was aware that other experts would disagree with his opinion and testimony about the workings of gangs in Hidalgo County, Texas."). Then, Respondent reasons that if Alvarez believed his testimony was accurate, the State cannot be "held accountable for any discrepancies between that testimony and the opinions espoused by experts over ten years later." Answer at 52.

However, this ignores the fact that Robert Alvarez knew his stated qualifications were false.[10] He thus, at the very least, knew that he was not a "gang expert." And there is good reason to surmise that Alvarez knew that the substance of his testimony was false. Officer Ramirez's uncontradicted declaration states that the gang expert involved in the team investigating the murders in this case was not Alvarez, but FBI Special Agent Nicole Gates. Ramirez further states that for reasons unknown to him, the State asked Alvarez to testify instead, Exhibit #26, Declaration of Reyes Ramirez (August 7, 2018) ¶ 16. Officer Ramirez himself was better qualified than Alvarez. As he declared: "I had much more experience than Alvarez in investigating gang cases, testifying in court, and extracting confessions from gang members, but was not recognized by the department as a 'gang expert.'" *Id.* ¶ 14. This suggests, though it does not conclusively establish, that no real expert was willing to supply the testimony the State needed to convict Petitioner.

Even if Alvarez himself genuinely believed the substance of his testimony was not false, he knew he was lying about his qualifications, and knowledge of that perjury is imputed to the State because Alvarez was part of the prosecution team. *Kyles*, 514 U.S. at 437 (every "individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, *including the police.*") (emphasis added). But it is likely that the State knew or suspected that the substance of Alvarez's testimony was also false. Consulting either the immediately available authentic gang expert FBI Special Agent Nicole Gates, or the accessible literature on Texas gangs, *see generally* Exhibit #15, Declaration of Professor Robert Fong (Jan. 22, 2018); Exhibit #17, Declaration of Rajeev Gundur (Jan. 26, 2018); Exhibit #19, Declaration of

---

[10] In particular, Alvarez lied about: having complete 112 college credit hours, attending the Rio Grande Valley "Gang Investigator's Course," his experience about gangs; and exaggerated the courses he completed in "Investigations." *See* First Am. Pet. at 61–69.

Professor David Skarbek (Jan. 31, 2018), would have rendered the falsity of Alvarez' assertions apparent.

### D.  Robert Alvarez's Testimony Was False and Misleading

Respondent contends that Petitioner's claim is merely based on a "discrepancy" between Alvarez and Petitioner's experts. In so doing, however, Respondent grossly minimizes the significance of statements whose falsity it cannot dispute, mischaracterizes the declarations of legitimate experts, and ignores the critical piece Alvarez's testimony played in both the guilt and penalty phases.

Respondent acknowledges that "Alvarez misstated the exact number of college credits he had earned, specific titles of continuing education courses he had attended," but nonetheless contends that Alvarez's testimony was not false or misleading. Answer at 52, 54. On the contrary, it *was* false, both with respect to his college credits and with respect to his professional training. Not only did Alvarez's testimony grossly overstate both, *see* First Am. Pet. at 62–65, but it formed the basis of the trial court's finding that he was an expert. Respondent cites no accurate facts in the record that would have permitted a finding that Alvarez was an expert, and without such a finding, Alvarez would not have been able to testify as to his uninformed—but uniformly damning—opinions.

Although Respondent disparages the qualifications of Dr. Fong, Dr. Skarbek and Dr. Gundur, Petitioner's gang experts, by saying that "These highly educated professors do not appear to have any local experience with street level gangs in any area, much less Hidalgo County," it does not supply any declarations of its own experts that impeach the qualifications or conclusions of the experts proffered by Petitioner. Then Respondent proceeds to handpick fragments of these

experts' declarations to corroborate bits and pieces of Mr. Alvarez's false testimony.[11] But Respondent's highly selective quotations obscures both the breadth of their expertise, and the degree to which they disagree with the most damaging aspects of Alvarez's testimony.

On gangs' use of "green lights," Respondent compares Alvarez's testimony:

> They had the authority, without asking permission from any particular gang member, to engage in whatever the situation required. If—its like anything from as simple as a fistfight to stabbing or murder, whatever the situation required for them to represent the gang.

to Dr. Fong's:

> Whenever a gang puts a 'green light' on an individual or another gang, the gang authorizes its members to attack those particular people, but the gang does not explicitly command its gang members to attack such individuals on sight.

Answer at 55 (internal citations omitted). Respondent then concludes that "[t]o suggest that these two descriptions are distinctive enough to rise to the level of false, misleading, or perjured testimony is disingenuous at best." *Id.* But Respondent fails to render an accurate description of Fong's testimony. After the quoted statement, Fong adds:

> Not all 'green lights' authorize gang members to murder because gangs do not engage in violence for the sake of engaging in it. A standing order to murder anyone on sight would be bad for business.

Exhibit 15, ¶ 15.

Thus, Dr. Fong's testimony clearly contradicts Alvarez's assertion that a "green light" automatically leads to an obligation to murder on sight.

---

[11] The Respondent's position seems to be that Dr. Fong, Dr. Skarbek, and Dr. Gundur lack expertise on the Hidalgo and Starr County gangs only to the extent that their testimony is unfavorable to the State.

Respondent also compares Alvarez's above-quoted statement to this language from Dr. Gundur's declaration:

> When an entire gang is included on a 'green light' list or has a 'green light' put on it, then any member of that gang may be attacked . . . The violence authorized by 'green lights' can range from simple assault and up to murder.

Answer at 55 n.17 (quoting Exhibit 17, ¶¶ 10, 12). In crafting this misleading comparison, Respondent fails to quote half of paragraph 12 from Dr. Gundur's declaration, which in its entirety reads:

> The violence authorized by "green lights" can range from simple assault and up to murder. However, "green lights" are not entirely all murder or to do as much violence as the gang member can possibly do to the other individual on sight. Gangs do not authorize "green lights" wantonly or ambiguously because gangs use "green lights" for particular purposes, specifically social control, and not for purposeless violence.[12]

The reading of the entire paragraph thus clearly conveys a different—and much less expansive—meaning of "green lights" than the one proposed by Alvarez, who said:

> They had the authority, without asking permission from any particular gang member, to engage in whatever the situation required. If—its like anything from as simple as a fistfight to stabbing or murder, whatever the situation required for them to represent the gang.

Answer at 55 (quoting Tr. Vol. 44 at 129–30).

---

[12] For an accurate description of the experts' testimony on green lights, including their contentions, contrary to Alvarez's perjured testimony, that green lights are not standing orders requiring gang members to do whatever the situation required to represent the gang, that gangs who become rivals or enemies do not automatically put green lights on each other, and that gangs do not enforce green lights on sight every time they see each other, see First Am. Pet. at 74–78.

Alvarez' testimony, unlike the declaration of either Fong or Gundur, deems the existence of a "green light" to confer broad authority on gang members to enforce the "green light" by however much violence is "required by the situation." But, according to Fong and Gundur, this is inaccurate; instead, the gang, *through its leadership*, chooses the amount of violence authorized by the "green light" for a particular purpose. Exhibit #19, ¶¶ 8–11 ("A high-ranking member within the gang authorized to make decisions must first approve of the people or gangs who are placed in the 'green light'. . . . Whenever the gang gives its members 'green lights,' the gang specifies the type of action authorized against those individuals or gangs. Therefore, a gang that puts a 'green light' on an entire rival gang does not specifically command its members to blindly murder members of the rival gang upon sight."); *see also* Exhibit #15, ¶ 7 ("If a gang wants its members to murder a specific individual or members of another gang, the gang ensures people know the gang wants those individuals murdered and not only assaulted.").[13] Thus, the reason to anticipate violence, as described by Alvarez, was far greater than that described by legitimate experts, and the reasons that extreme violence was discouraged were entirely omitted by Alvarez. More broadly, in the absence of Alvarez's expert testimony, the jury would not have heard any speculation at all about what green lights might or might not mean.

Most importantly, Respondent does not even address the expert testimony that completely discredits Alvarez's contention that Petitioner was a high-ranking official *who would have had knowledge of a green light*.[14] If there was no reason to believe Petitioner would have known of a

---

[13] If Alvarez was correct, his testimony would suggest that a gang's chain of command is non-existent. If so, Alvarez would be contradicting his own expert testimony. *See, e.g.*, Tr. Vol. 44 at 114–15 (testifying about gangs' hierarchy and chain of command).

[14] This argument is set forth in more detail in First Am. Pet. at 78–82.

green light, there was no factual basis for relying on a green light to infer either constructive or actual anticipation of a homicide.

### E.  The Suppressed Evidence was Favorable and Material

Respondent's contention that the suppressed evidence was neither favorable to Petitioner nor material, Answer at 52, cannot be reconciled with the record. Respondent claims without any basis that the State's case on Petitioner's mental state "was not weak and Medrano fails to show any harm from the use of Alvarez's testimony because the outcome of the trial would not have been different had Alvarez's testimony been impeached." *Id.* Alvarez's testimony was *the* crucial link between Petitioner's acknowledged gang membership and proof of the mental state necessary to establish his guilt of capital murder, and eligibility for a death sentence. The State recognized this when the prosecutor stated during Alvarez's qualification:

> [Alvarez] will identify him as a gang member. And the gang member is a central issue in this because this is a gang related crime and the defendant's affiliation with that gang is an *essential issue* in this case as to what the motive was, what his knowledge of what could happen was, what his anticipation was, absence of mistake in handing these people these people these weapons, his knowledge of that gang, his membership in that gang . . . and that gang's involvement is all relative in this case, Your Honor.

Tr. Vol. 44 at 50 (emphasis added).

Respondent seems to imply that the suppressed evidence of Alvarez's false testimony was not material because the "State's case on Medrano's mental state in regard to the commission of the murder was not weak . . . ." Answer at 52. What that is supposed to mean is unclear, but it is also beside the point: whether or not the State had *some* other evidence, without the false testimony of the State's key witness on this "essential issue" (or with its weight heavily discounted by his revealed mendacity) there is a reasonable probability that the State would not have been able to

persuade the jury that Petitioner "should have anticipated" the commission of the murders, and therefore, a reasonable probability that Petitioner would have been acquitted of capital murder. Moreover, even if the jury had somehow concluded that he *should* have anticipated those crimes, it would have had no factual basis at all for concluding that he *did* anticipate them, and therefore could not (rationally and lawfully) have sentenced him to death. *See* First Am. Pet. at 86–90. Contrary to Respondent's assertion, this is not speculation; the State itself highlighted the importance of Alvarez's testimony for its case.

Both the State's argument for Alvarez's qualification as an expert and its closing arguments demonstrate that the State viewed Alvarez's testimony as essential and was relying on his opinion as an expert witness to support the inference that Petitioner should have anticipated the commission of the murders. In its closing argument at the guilt phase, the prosecutor relied upon Alvarez's "green light" testimony, along with what Alvarez claimed that Petitioner knew:

> There was a green light between the TCB, between the Chicanos and the Tri City Bombers, these two rival gangs. This defendant knew that if those two came up against each other, whatever needed to be done was going to be done. And in this case, that's what happened.

Tr. Vol. 46 at 27. Equally telling is the Texas Court of Criminal Appeals' citation of Alvarez's testimony that:

> [T]he Bombitas and the Chicanos have a "green light," which is a standing order to do whatever is necessary to 'represent' the gang every time they see each other. [Alvarez] testified that the green light as to the Chicanos has existed for years and that anyone in the gang would be aware of any green light against any other gang.

*Medrano v. State*, No. AP-75320, 2008 WL 5050076 at *13 (Tex. Crim. App. Nov. 26, 2008). Relying on that testimony, the TCCA held that "Alvarez's testimony served to explain the

relationship between the rival gangs and the green light that existed between them," and that "Alvarez's testimony provided further corroboration and explanation of [Petitioner's] statements in the context of gang rivalries and protocol." *Id.*

Thus, absent the suppression of exculpatory information impeaching Alvarez's qualifications and the substance of his testimony, there is a reasonable probability that the jury would have acquitted Petitioner of capital murder, and also a reasonable probability that it would have found him ineligible for a sentence of death. Further, absent the suppression of exculpatory information impeaching Alvarez's qualifications and the substance of his testimony, there is also a reasonable probability that even if the jury acted irrationally, the TCCA would not have upheld Petitioner's conviction and death sentence.

Respondent also argues: "Medrano may have been able to provide minor impeachment of Alvarez's testimony on grounds that Alvarez misstated the exact number of college credits he had earned, specific titles of continuing education courses he had attended, or who specifically agreed or disagreed that he was a 'gang expert.' But, as discussed above, this impeachment would not prove Alvarez's testimony was false or unreliable." Answer at 53. Respondent's assertion defies common sense, as well as the legal significance of expert testimony. If Petitioner had been able to impeach Alvarez's testimony on grounds that he misstated—lied—about his qualifications, it would have, at the very minimum, demonstrated that Alvarez's testimony as to his qualifications was both false and unreliable, and also cast a shadow over the entirety of the substance of his testimony. But more likely, it would have resulted in the exclusion of Alvarez's lay opinion testimony.

Respondent further minimizes the gravity of Alvarez's perjured testimony when she says that "[i]t defies belief to suggest that the jury would have disregarded Alvarez's testimony if they

knew that the actual number of college credits he had earned was eight less than he testified to." Answer at 53. In addition to ignoring that that testimony was a *lie*, it ignores that the appropriate methodology is not piecemeal discounting of exculpatory evidence; rather the materiality of "suppressed evidence [must be] considered collectively, not item by item." *Kyles*, 514 U.S. at 436; *Crawford*, 311 F.3d at 1326; *Scheer*, 168 F.3d at 452. Taken together, the truth about Alvarez's lack of qualifications and his willingness to lie about this would have completely discredited his credibility as a gang expert and the substance of all of his testimony on the workings of gangs, Petitioner's role in the gang, and inferences about what Petitioner knew and would have anticipated. *See* First Am. Pet. at 87.

Finally, throughout its Answer, Respondent repeatedly misstates the relevant legal standard for materiality: "[i]t defies belief to *suggest that the jury would have disregarded* Alvarez's testimony if they knew that the actual number of college credits he had earned was eight less than he testified to."; "Medrano fails to provide anything other than speculation that the evidence he now presents, had he been able to impeach Alvarez with it, *would have caused the jury to find him not guilty of capital murder.*" Answer at 53 (emphasis added). However, Petitioner is not required to show that the jury *would have*  found him not guilty (since that is almost always unknowable) but only that "there is a *reasonable probability* that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles*, 514 U.S. at 433–34 (quoting *Bagley*, 473 U.S. at 682). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.*; *accord Crawford v. Head*, 311 F.3d 1288, 1325 (11th Cir. 2002). Under the correct standard, Petitioner has met his burden.

**IV.**     **GROUND IV: PETITIONER'S CONVICTION AND DEATH SENTENCE VIOLATES DUE PROCESS BECAUSE THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUSTAIN HIS CONVICTION AND PUNISHMENT.**

### A.  Summary of the Claim

Due process "protects the accused against conviction except upon proof beyond a reasonable doubt of *every* fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970) (emphasis added). The Fourteenth Amendment guarantees that "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof— defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of *every* element of the offense." *Jackson v. Virginia*, 443 U.S. 307, 316 (1979) (emphasis added).

Here, the State introduced Petitioner's recorded statement through Officer Ramirez and expert testimony from Robert Alvarez to prove that Petitioner anticipated the commission of the murders when he provided the weapons to his co-conspirators for a marijuana robbery. This evidence was sufficient to prove robbery, but insufficient to establish that Petitioner "should have anticipated" that his co-conspirators would commit murder, and therefore insufficient for any rational trier of fact to find Petitioner guilty of capital murder under Texas Penal Code § 7.02(b).

Furthermore, the evidence presented by the State at sentencing was insufficient to establish that Petitioner *actually* anticipated that his co-conspirators would commit murder and consequently, insufficient for any rational trier of fact to sentence Petitioner to death under Texas Code of Criminal Procedure § 37.071, § 2(b)(2).[15]

### B.  Petitioner Overcomes his Burden Under AEDPA Because the TCCA's Denial of Relief Rested on an Unreasonable Application of the Law to the Facts and an Unreasonable Determination of Facts

---

[15] The factual basis for this claim is set forth in more detail in First Am. Pet. at 90–102.

Respondent argues that Petitioner cannot overcome the presumption of correctness afforded to the TCCA's denial of this claim on direct appeal, Answer at 60, contending that a "mere disagreement on how the jury interpreted the evidence does not rise to the level of legal insufficiency." *Id.* at 66. But this is not a mere disagreement on how the jury interpreted the evidence; in reviewing the conviction, the TCCA affirmed Petitioner's death sentence by relying on an unreasonable application of the law to the facts under 28 U.S.C. § 2254(d)(1).

Respondent essentially reproduces portions of the TCCA's opinion on direct appeal, and then points to Petitioner's allegedly conflicting statements:

> For example, on the subject of the Donna murders and whether he was aware of the fact that members of his gang participated in that multiple murder using his weapons, Medrano states that his "statement to Juan Sifuentes introduced during the sentencing phase asserts that he learned after the fact that the other gang members, without [Medrano's] awareness or permission, took some of [Medrano's] weapons, and used them for the Donna murders." However, Medrano tells Ramirez that the incident began as a "hit". The explanation of how it occurred and the events leading up to it provided the jury sufficient opportunity to infer that he had that knowledge prior to the murders in this case.

From this, Respondent claims that "[a] reasonable jury could reasonably infer that the Donna action was intended to cause the death of someone, that the part went wrong was simply that the wrong people were killed, and importantly that Medrano knew all of this information, and more, when he provided the weapons to carry out the murders here." Answer at 67–68.

 This might be true, but it would not be sufficient to ground liability for capital murder. That Petitioner knew about the killings in Donna, does not, without more, support an inference that he should have anticipated the murders here. Respondent seems to claim that because

Petitioner knew some gang member had committed murder on a prior occasion, he should have anticipated every gang member would commit murder on every occasion. Or perhaps Respondent is asserting that because Petitioner knew about the loss of life that occurred during a gang "hit," he should have anticipated the same risk of loss of life when he provided weapons for a robbery.

But no rational trier of fact could have found that Petitioner *should have* anticipated the murders committed by his co-conspirators (and therefore could find him guilty of capital murder) for at least three reasons: 1) there was no evidence that Petitioner, *before the fact*, knew or should have anticipated which gang members would participate in the robbery, and in particular, whether there was any overlap between the participants in the Donna killings and the participants in the planned marijuana robbery; 2) there was no credible evidence that Petitioner, *before the fact*, knew about the "green light" against the Texas Chicano Brotherhood;[16] and 3) there was no evidence at all that he knew beforehand that the occupants of the house to be robbed were members of that gang. *See* First Am. Pet. at 105–06. Indeed, there is no evidence that any of Petitioner's fellow gang members knew that rival gang members would be there.

Certainly, no rational trier of fact could have found, based on the Donna killings, that Petitioner *actually* anticipated the commission of the murders, and therefore find him death-eligible. Even if Petitioner believed that the participants in the Donna killings would kill again, there was no basis in the evidence to find that he knew that those gang members were going to participate in the robbery. Moreover, even with respect to the two fellow gang members who had committed the Donna "hit" murders, there was no reason to believe that they *would* kill in the course of a marijuana robbery, given that the crimes were completely different both in their design

---

[16] Although Robert Alvarez testified that there was a "green light" between the Tri-City Bombers and the Texas Chicano Brotherhood permitting their members to do "whatever the situation required for them to represent their gang," Tr. Vol. 44 at 127–30, there was no evidence that Petitioner actually knew that there was a "green light."

and motivation. Finally, Petitioner was not present at *either* of the two events and thus his ability to infer any possible similarities was very limited. *Id.* at 109–10.

Respondent does not really address these contentions, but instead restates the TCCA's opinion, and offers snippets of Petitioner's statements that distort the evidence before the jury and the TCCA. For example, Respondent says that "statements [Petitioner] argues are exculpatory could just as easily be interpreted to demonstrate [Petitioner's] knowledge of the operation prior to its execution." Answer at 68. As an example, Respondent quotes the following statement that Petitioner gave to Officer Ramirez: "[W]hen they first called me, they asked me if I wanted to go and I told them no because, I mean, I've never done something like that. I don't do that, you know." *Id.* n.19 (quoting Tr. Vol. 43 at 63–64). But this quote must be read together with the statement Petitioner made to Officer Ramirez moments later, which Respondent conveniently fails to report: "Yo tenia entendido[17] that it was going to be - - they were just going to rob some marijuana, some pounds." Tr. Vol. 43 at 86. Indeed, nothing in the record—and certainly not any knowledge Petitioner may have had of the Donna killings—supports the claim that Petitioner anticipated or even should have anticipated the loss of human life when he provided weapons for a marijuana robbery.

For these reasons, there was insufficient evidence in the guilt-or-innocence phase to prove that Petitioner should have anticipated the murder of the victims, and insufficient evidence in the sentencing phase to prove that Petitioner actually did anticipate the loss of human life. The TCCA's determination that the evidence was sufficient thus was based upon either an "unreasonable

---

[17] The translation in English is "I had understood."

determination of the facts" or an "unreasonable application of the law to the facts." 28 U.S.C. §§ 2254(d)(1)–(2). *See* First Am. Pet. at 111.

The TCCA's resolution of this issue also rests upon facts not in evidence, a manifestly unreasonable way to determine facts and/or apply the law to the facts. During the suppression hearing, the trial judge heard the complete recording of Petitioner's statement to Officer Ramirez. That recording included a question by Ramirez as to whether Petitioner knew anything about a homicide committed at a trailer park. Tr. Vol. 15 at 64. However, the prosecution and defense agreed to redact this passage from the recording. Tr. Vol. 42 at 68–72. Consequently, no mention of this unrelated murder "in a trailer park" was ever introduced in evidence during Petitioner's trial, and thus, could not have contributed to the sufficiency of evidence supporting a sentence of death. The TCCA nonetheless cited this unrelated murder as support for sufficiency of evidence that Petitioner "anticipated" the loss of human life. *Medrano v. State,* AP-75,320, 2008 WL 5050076, at *25 (Tex. Crim. App. Nov. 26, 2008).[18]

Respondent's Answer says nothing about this indisputably unreasonable methodology. Respondent also fails to address Petitioner's argument that the TCCA's determination is against the weight of its own precedent. *See* First Am. Pet. at 107–108.

**V.**     **GROUNDS V AND VI: PETITIONER'S DEATH SENTENCE VIOLATES THE EIGHTH AMENDMENT'S PROVISION AGAINST CRUEL AND UNUSUAL PUNISHMENT.**

**A.  Summary of the Claim**

---

[18] Even if the jury *had* heard this portion of the recording, it would not have provided evidence that Petitioner anticipated the loss of life that occurred during the marijuana robbery because Petitioner knew little about this unrelated murder, and with respect to the murder, stated that "I mean, we don't do that." Tr. Vol. 42 at 68–72 (citing Rodolfo Medrano/Reyes Ramirez, FBI Transcription, 32–34 (Jan. 25, 2003)).

The Eighth Amendment precludes imposition of the death penalty on a defendant tried for felony murder unless the defendant was both a major participant in the underlying felony and had a mental state of reckless indifference to human life. *Tison v. Arizona,* 481 U.S. 137, 137–38 (1987). Here, Petitioner's sole contribution to the robbery was his act of supplying *some* of the guns used in the robbery, *guns that were not among the guns established to have caused death*. This action, unaccompanied by planning activity or presence at the scene of the crime, did not constitute major participation in the robbery, and does not rise to the level of reckless indifference to human life. Consequently, Petitioner's death sentence violates the Cruel and Unusual Punishment Clause of the Eighth Amendment.[19]

### B. The TCCA's Rejection of This Claim Was Contrary to, or Involved an Unreasonable Application of, Clearly Established Federal Law

The TCCA denied the merits of this claim on direct appeal, but this decision was contrary to, or involved an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1). The claim was also raised as part of another claim on state post-conviction proceedings. The post-conviction court denied it and the TCCA affirmed, noting the claim was procedurally defaulted. Judge Alcala dissented: "Because I view *Tison* as establishing a categorical ban on executing certain individuals whose moral culpability is too minimal to warrant a sentence of death, I do not view direct appeal as constituting a defendant's sole opportunity to litigate that issue." *Ex parte Medrano*, 532 S.W.3d at 396 (Alcala, J., dissenting).

---

[19] The factual basis of this claim is set forth in more detail in First Am. Pet. at 111–14.

Because *Tison* does not permit the execution of someone with Petitioner's degree of participation, the TCCA's determination is contrary to, or involves an unreasonable application of, clearly established federal law.[20]

### C. Petitioner Did Not Exhibit Reckless Indifference to Human Life and Was Not a Major Participant in the Robbery

Respondent argues that Petitioner had sufficient mental culpability to sustain his death sentence. Answer at 68. According to Respondent, the evidence supports a finding that he exhibited a "reckless disregard for human life" and was a major participant in the crime. *Id.* at 71. To reach this conclusion, Respondent contends that "anticipat[ing] that a human life would be taken *is* sufficient to satisfy the requirement of *Tison* that the defendant act with a 'reckless indifference to human life.'" *Id.*

Perhaps that is true. But Respondent fails to offer record support for the premise that Petitioner actually anticipated the loss of life. Instead, Respondent purports to offer a pertinent example from *Tison*: "A robber who kills during the commission of his intended offense, and who acts with utter indifference to the fact that his robbery may have the unintended consequence of the death of his victim, exhibits a 'reckless indifference to the value of human life [that] may be every bit as shocking to the moral sense as an 'intent to kill.'" *Id.* (quoting *Tison*, 481 U.S. at 157). Doubtless that is true. But in the example from *Tison*, recklessness is inferred from the participation in the robbery *and* participation in the act of causing death. Here, however, Petitioner killed no one, agreed to kill no one, planned to kill no one, and intended to kill no one. As explained

---

[20] Alternatively, as Judge Alcala's dissent argued, an "applicant is entitled to litigate his Eighth Amendment claim at this stage, and [he should be permitted] to further develop this claim through an evidentiary hearing." *Ex parte Medrano*, 532 S.W.3d at 396. Accordingly, should this court determine that the state court record does not establish a violation of the Cruel and Unusual Punishment Clause, Petitioner should be afforded the opportunity to present additional evidence relevant to this claim at an evidentiary hearing.

in the First Amended Petition, Petitioner did not exhibit the reckless indifference to human life *Tison* deemed sufficient to ground death eligibility. First Am. Pet. at 119–121. *Tison* employs two hypotheticals to illustrate how reckless indifference may occur in the absence of intent to kill: that of a torturer who does not intend to kill the victim, and that of a robber who kills in the course of a robbery.  But Petitioner did not cause death, and he did not intend to cause pain—let alone death. Respondent fails to address these key distinctions.

Respondent also argues "[t]he fact that Medrano anticipated life would be taken, and still proceeded to participate in a planned robbery where lethal force was used, shows his reckless indifference to life." Answer at 71. But Respondent's conclusion both requires the premise that Petitioner in fact anticipated that life would be taken, and that the use of lethal force by some other person is the equivalent of the defendant's use of lethal force. However, as set forth previously, there is no support in the record for the proposition that Petitioner in fact anticipated that a killing would occur, and Petitioner himself did not cause death, nor, unlike the *Tison* brothers, was he even present when death was caused, and therefore able to prevent the taking of life.

Respondent also contends that "[t]he fact that Medrano was aware that members of this particular group of Bombitas were also participants in the Donna shootings, or that the robbery was of members of a rival gang, the Chicanos, merely serves to underscore Medrano's mental culpability in the murders herein." *Id.* at 72. Once more, the argument must fail because the factual premise is wrong. More precisely, the premise is doubly wrong. There is no evidence in the record that Petitioner was either aware that "this" particular group of Bombitas were also participants in the Donna shootings, or that the robbery was of members of the Chicanos. The statement to Officer Ramirez shows that Petitioner only knew what he was told: that the gang needed Medrano's

weapons for a marijuana robbery. There was no mention of the location, the rival gang, the Bombitas who would be involved, or even the date of the robbery.[21]

Where the defendant did not participate in causing death, the Eighth Amendment requires not only reckless indifference, but also "major participation" in the predicate felony. Respondent contends that Petitioner's participation satisfies this requirement because he "willingly delivered the weapons to fellow members in a violent gang so they could carry out the robbery of a large quantity of drugs, and acted after the fact to destroy evidence and attempt to distance himself with the weapons." *Id.* at 71. But a comparison of Petitioner's role with that of the *Tison* brothers (or that of other nontriggermen in cases in which a sentence of death has been upheld) comes up short.[22] *See* First Am. Pet. at 117–19 (comparing Petitioner's participation with that of the defendants in *Enmund*, *Tison*, and *Dickens*). Respondent offers not even a single case in which a defendant with Petitioner's degree of participation was convicted and sentenced to death.

Because Petitioner was a nontriggerman who did not kill anyone, plan to kill anyone, or agree to kill anyone, was not a major participant in the predicate felony, and did not exhibit reckless indifference to human life, the TCCA's finding that he was death eligible is contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1). *See* First Am. Pet. 121–24.

---

[21] Respondent also asserts that Petitioner exhibited "behavior that anyone would anticipate would result in violence carrying with it a likelihood of death resulting, robbery being an inherently violent enterprise, in this case exacerbated by this being a robbery from drug dealers, who are notorious for possessing and using weapons." Answer at 71–72. If Respondent means to say that any gang member, in any gang, involved in any robbery (or at least any robbery of drug dealers), anticipates the loss of life, Respondent offers no support in the case law for such a sweeping assertion—and for good reason, because there is none.

[22] Very few lower court cases address what actions are sufficient to establish eligibility for a sentence of death in a case where the defendant has neither killed nor intended to kill. Judging from the very small number of cases in which a nontriggerman has been executed, this is likely because death is sought in so few nontriggerman cases. All cases of which undersigned counsel are aware involve defendants who were at the crime scene. This is not such a case.

## VI.      GROUND VII: TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE TO PETITIONER.

### A.  Summary of the Claim

Petitioner raised ten instances of ineffectiveness of trial counsel that resulted in prejudice to Petitioner, whether viewed individually or cumulatively. All of the facts alleged in the First Amended Petition in Grounds I, II, III, IV, V, and VI, are incorporated by reference as support for this claim. Additional pertinent facts are discussed in each subpart in reply to Respondent's Answer. Petitioner's reply to Respondent's claim that Grounds VII(2), VII(3), VII(4), VII(6), and VII(7) are procedurally defaulted has already been set forth. Petitioner's reply to Respondent's claim on the merits of Ground VII is set forth below.

### B.  Specific Instances of Ineffectiveness

#### 1.  VII(1) Trial Counsel were Ineffective for Failing to Challenge Petitioner's Confession as Inadmissible Due to Promises of Leniency

##### a.   Summary of the Claim

As set forth in more detail in Ground I, Petitioner confessed after the State, through Petitioner's wife, conveyed a promise of leniency. Petitioner told trial counsel Hector Villarreal about these events, and in particular, told him that it was Officer Ruiz who had brought Juana in to see him, and Officer Ruiz to whom counsel should speak. Nothing in trial counsel's file suggests that he ever spoke to Ruiz, or for that matter, to any other police officer involved in the case. Trial counsel did move to suppress the statement on voluntariness grounds, but the only facts he alleged relevant to voluntariness were that Petitioner had not slept for more than two days before he made the statement, and he produced no evidence supporting this assertion. The State did not call Officer

Ruiz, and neither did Villarreal. Not surprisingly, the trial court determined that the statement was voluntary.

Failure to investigate a strong basis for suppressing Petitioner's statement as involuntary constituted deficient performance. *See Kimmelman v. Morrison*, 477 U.S. 365 (1986) (finding failure to investigate the basis for suppressing the fruits of an illegal seizure deficient performance). Villarreal should have spoken to Officer Ruiz, or called him as a witness, and he should have called Petitioner and Petitioner's wife as witnesses. There can be no strategic reason for failing to raise this claim and support it with evidence, given that Villarreal raised another (factually unsupported) voluntariness claim.

> b.   The TCCA's Decision Relied on an Unreasonable Determination of Facts and Was Contrary to, or Involved an Unreasonable Application of, Clearly Established Federal Law

In his First Amended Petition, Petitioner explained why the TCCA's denial of this claim rested on an unreasonable determination of the facts in light of the evidence presented to the state court, and was contrary to, or involved an unreasonable application of, clearly established federal law. 28 U.S.C. §§ 2254(d)(1)–(2); *see* First Am. Pet. at 135–38.

Respondent's Answer does not directly address Petitioner's arguments, but simply repeats the post-conviction court's findings of fact and conclusions of law.

Respondent argues that "[i]n the absence of anything to rebut presumption of reasonable strategy, it must be presumed that counsel's decision not to attempt to suppress Medrano's statement on the grounds Medrano suggests in this case was based upon trial strategy." Answer at 39–40. There is no evidence in the record that trial counsel investigated this basis for suppressing Petitioner's statement, and then for strategic reasons chose not to pursue it. Counsel

must investigate any strong basis for suppressing inculpatory evidence. *See Morrison*, 477 U.S. at 384. Because Petitioner had relayed to lead counsel Villarreal the events that led to his confession, Villarreal should have investigated these circumstances as a basis for suppressing Petitioner's statement.[23]

Moreover, Respondent is wrong in claiming that there is nothing to rebut the presumption of reasonable strategy. Answer at 39. Petitioner told Villarreal how the confession was extracted. Villarreal's failure to investigate a strong basis for suppressing Petitioner's statement as involuntary constituted deficient performance under *Morrison*. *See* First Am. Pet. at 135. Respondent's assertion that "counsel's decision not to attempt to suppress Medrano's statement on the grounds Medrano suggests in this case was based upon trial strategy" is completely implausible. The evidence that defeats Respondent's speculative assertion of strategy is the undeniable fact that counsel *did* move to suppress the statement, albeit on alternative, factually unsupported, grounds. Consequently, there could be no legitimate strategy in not presenting a stronger basis for suppression—and certainly no basis for refusing to investigate it.

To be sure, as Respondent notes, the record contains an affidavit from assistant counsel, Oscar Rene Flores, who reported no memory of being told about a promise of leniency, and then claimed that had the defense known of a promise, they would have presented that information at a suppression hearing. Answer at 40 n.13. But as Judge Alcala noted in dissent, Flores's affidavit, even if credible, is not necessarily inconsistent with Petitioner's or his ex-wife's affidavit. *Ex parte*

---

[23] The post-conviction court also found that: "The lack of any such evidence to support [Petitioner]'s claim [at his suppression hearing, trial and on direct appeal that this statement was involuntary] provides a ready explanation for [Petitioner]'s attorneys' failure to present any evidence supporting their claim that [Petitioner]'s statement was not voluntarily given." FF&CL at 463, ¶ 110. This circular reasoning cannot be reconciled with clearly established Supreme Court precedent. Under *Morrison*, counsel has the duty to investigate a strong basis for suppressing evidence. *See* 477 U.S. at 384. Here, there is no evidence in the record only because counsel failed to produce it. Counsel's insufficient investigation cannot excuse counsel's insufficient performance in producing evidence.

*Medrano*, 532 S.W.3d at 397 (Alcala, J., dissenting); *see also*, *id.* at 399 (Richardson., J., dissenting) (noting that many of the lower court's findings lacked support in the record.). Flores is not recalling his own interactions with Petitioner, nor does he claim that he would have been the person Petitioner would have told about the circumstances under which his confession was obtained; as Flores acknowledged, it was Villarreal, not Flores himself, who was primarily responsible for the guilt phase case. *See* Affidavit of O. Rene Flores (May 28, 2015) at 13, 15. And, Petitioner did not claim that he told Flores, but that he told Villareal. Sworn Inmate Declaration of Rodolfo Medrano (July 8, 2015) at 1.

Precisely because Flores cannot recall certain events, this Court should hold an evidentiary hearing to conduct findings of fact on this claim. This was Judge Alcala's position: "Even if, as the habeas court found, co-counsel Flores's affidavit is credible, the better course under these circumstances, in which counsel states that he simply cannot recall certain events, is to permit applicant to cross-examine counsel in order to possibly refresh his memory by questioning him as to particular details or developments." *Id.* at 397.

Respondent also argues that trial counsel were not ineffective because the claim was meritless anyway, and so trial counsel were not deficient for failing to raise it. Answer at 40. Respondent confuses the issue: trial counsel's performance was deficient for failing to *investigate* the claim, which at least on its face, is far more persuasive than the claim he did present.

Contrary to Respondent's assertions, trial counsel's deficient performance was clearly prejudicial. The facts trial counsel failed to investigate and present would have established the involuntariness of Petitioner's statement. Without that statement, the centerpiece of the State's case against Petitioner, Petitioner could not have been convicted of capital murder. Thus, there is

more than "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

> 2. *VII(2) Trial Counsel were Ineffective for Failing to Challenge the Admission of Petitioner's Confession as a Violation of Miranda Based on Officer Ruiz's Assurances, which both Constituted Interrogation After Petitioner's Invocation of his Right to Counsel, and Failed to Scrupulously Honor his Invocation of his Right to Remain Silent.*

> a. Summary of the Claim

Just as trial counsel were ineffective in failing to raise a voluntariness claim based upon the promises to Petitioner's wife, trial counsel were ineffective in failing to assert that those promises, made by a police officer to Petitioner's wife and conveyed to Petitioner through her, constituted interrogation within the meaning of *Miranda* and failed to honor Petitioner's invocation of the right to remain silent, thus barring the introduction of his statement. It was deficient performance not to do so, and given that trial counsel moved to suppress the statement, there is no plausible strategic ground for not asserting a far better ground for its suppression. As is true with respect to the failure to raise a voluntariness claim based upon these events, the centrality of Petitioner's statement to his conviction of capital murder compels the conclusion that this deficiency prejudiced him.

> b. Respondent Wrongly Argues That Trial Counsel Made Most of the Fifth Amendment Arguments Petitioner Now Raises

As in the Answer to Ground II, Respondent erroneously asserts that "trial counsel and appellate counsel raised the Fifth Amendment violation which was overruled and denied, respectively." Answer at 39. Respondent misses the point again, because the Fifth Amendment violation that was decided is not the one presented in this claim. *See supra* pp.35–36. This claim is unexhausted, but not procedurally barred. *Supra*, pp.5–27.

Still, Respondent contends that trial counsel "made [] most of the Fifth Amendment arguments Medrano now says he was deficient for not making" at the suppression hearing. Answer at 40. To be sure, trial counsel raised a *Miranda* violation at trial and on appeal. But it is simply not true that he made "most of the Fifth Amendment arguments" Petitioner argues he was deficient for not making, because he did not raise the arguments Petitioner puts forth here—that Officer Ruiz's assurances, which he conveyed to Petitioner's wife and facilitated her passing on to Petitioner, both constituted interrogation within the meaning of *Miranda*, and failed to honor Petitioner's invocation of his right to remain silent.

Respondent also contends that trial counsel were not ineffective for not raising this claim because "as the trial court overruled the more traditional objections, there is no doubt that these innovative objections would have been overruled," and trial counsel "cannot be deemed deficient for not making a frivolous objection." Answer at 41.

This assertion too is another version of the post-conviction court's unreasonable findings of fact in relation to the substantive merits of Petitioner's voluntariness claim VII(1).[24] *See* First Am. Pet. at 137. Moreover, the trial court's negative adjudication of *factually unsupported Miranda* claims has no bearing at all on these claims, which are supported by facts. Moreover, even if trial counsel in fact thought these claims were frivolous—a proposition for which there is no supporting evidence—they were under a duty to investigate and research them. *Morrison*, 347 U.S. at 384. Had they done so, he would have found ample factual and legal support.

---

[24] In particular, the following findings: 1) Even if trial counsel knew about the promise Edgar Ruiz made to Juana, they cannot be faulted for not presenting testimony so asserting because the claim that Ruiz made the promise "is clearly not credible." FF&CL at 463, ¶ 113; and 2) Even if trial counsel were informed of the factual assertions contained in Petitioner's Sworn Inmate Declaration, they were not ineffective for failing to present this information. *Id.* at 465, ¶ 116.

As with claim VII(1) above, because of the centrality of Petitioner's statement to his conviction of capital murder and his death sentence, trial counsel's deficiency caused prejudice.

### 3. VII(3) Trial Counsel were Ineffective for Failing to Challenge the Truthfulness of the Testimony of the State's Purported Gang Expert

#### a. Summary of the Claim

The facts in support of this claim are summarized *supra* at p.16, and set forth fully in the First Amended Petition at 139–52.

#### b. Trial Counsel's Failure to Effectively Challenge the Testimony of Robert Alvarez Did Not Reflect a Strategic Judgment, and Constituted Deficient Performance.

Respondent posits that trial counsel's failure to challenge the truthfulness of Robert Alvarez's testimony was due to a reasonable, strategic decision. Answer at 56. This contention is without support in the record. It is literally impossible to imagine what strategic advantage could flow from the failure to challenge Alvarez's testimony. Respondent has not attempted to explain what advantage might flow from trial counsel's omissions. "Strategy" is not a magic wand to wave that makes IATC claims disappear; there must be some possible, plausible strategic advantage for failure to investigate, and here there was none.

Trial counsel's performance is deficient whenever he breaches his duty "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *Hinton v. Alabama*, 134 S. Ct. 1081, 1088 (2014). Here, trial counsel failed to obtain materials that would have demonstrated that Alvarez lied about his qualifications. Exposing those lies likely would have precluded his testimony entirely, or at the very least, would have provided the jury with multiple reasons to discount it. But having failed to

investigate his qualifications, counsel failed to exclude his opinion testimony under Rules 702 and 704, and failed to give the jury any reason to discount his exaggerated account of Petitioner's role and culpability.[25]

Respondent's attempt to defend trial counsel's meager efforts is counterproductive. By noting that "counsel lodged vociferous objections to the late disclosure of Alvarez's qualifications, conducted an extensive voir dire in an attempt to prevent his qualifications as an expert witness, and when these tactics failed, counsel requested his objections be noted and proceeded to cross-examine Alvarez aggressively," Answer at 57, Respondent only demonstrates no strategic reason existed for counsel's failure to *effectively* challenge Alvarez. Moreover, puffing up what counsel did cannot distract from what he failed to do. Trial counsel lodged objections, but he should have investigated Alvarez, and had he done so, he could have *successfull*y challenged his qualifications. Moreover, neither voir dire nor "aggressive" cross-examination was an adequate substitute for a true gang expert, who could have informed the cross-examination and contradicted Alvarez's false assertions about Petitioner's status in the gang, as well as his exaggerated account of Petitioner's "green light" culpability. *See* First Am. Pet. at 153–56.

### c. Trial Counsel's Deficient Performance Prejudiced Petitioner at both the Guilt and Penalty Phases

Respondent argues that "after over a decade, and with the assistance of multiple attorneys and investigators, Medrano still fails to significantly damage the substance of Alvarez's testimony. To suggest that trial counsel should have done better than Medrano's current attorneys is unreasonable and impractical." Answer at 56. Respondent further urges that Petitioner fails to

---

[25] Respondent also ignores Petitioner's allegation that trial counsel's failed to object to improper Spanish translation of Petitioner's confession. *See* First Am. Pet. at 142–52.

demonstrate prejudice in part because "Medrano's own statement acknowledged, among other things, that he was a gang member, and that there was a feud with the Chicanos." Answer at 57. Both assertions are groundless.

First, the evidence Petitioner has adduced in his Petition *does* "significantly damage the substance of Alvarez's testimony;" it demonstrates that, *at the very least*, *Alvarez lied about his qualifications, and had no expertise in the substance of the matters about which he testified*. As set forth in detail in the First Amended Petition at 62–69, Alvarez perjured himself when he lied about his qualifications, training, and past positions. Moreover, the most reasonable inference from all of the facts is that Alvarez knowingly lied with respect to the substance of his testimony as well, exaggerating Petitioner's role in the gang, exaggerating the likelihood that lethal violence would result from a planned marijuana robbery, and exaggerating the likelihood that Petitioner would anticipate such violence.

Second, although Petitioner has never disputed that he was a gang member, that affiliation alone obviously does not make him death-eligible. In saying that "Medrano's own statement acknowledged, among other things, that he was a gang member, and that there was a feud with the Chicanos," Respondent asserts as fact what is disputed, mischaracterizes Petitioner's statements about the feud with the Chicanos, and repeats Alvarez's damagingly inaccurate translation of Petitioner's statement. As argued in the First Amended Petition, when conveying to Officer Ramirez how he learned *after the fact* the reason behind the murders committed at the location of the robbery, Petitioner explained:

> [RAMIREZ]. Okay. Okay. Este, so you're saying that this is what - - what happened. The - - the motive of - - of this was to - - just to rip them off of their - - of their drugs and the money and maybe guns if they had them there, but something went wrong. Did you -

> - did you ever talk to anybody about what really happened, what
> went wrong?
>
> [PETITIONER]. They - - they found letters. [RAMIREZ]. Oh,
> they found some letters?
> [PETITIONER]. Letters in the - - the drawers or a paper or
> somewhere y dijeron que eran Chicanos.[26] They could be
> Chicanos. *Y pos fuimos enemies*.[27] I guess that's why they - -
> [RAMIREZ]. They decided - -
> [PETITIONER]. Yeah, they decided to take them out ya que
> estaban ahi.[28]

Tr. Vol. 43 at 85–86 (emphasis added).

During his testimony, Alvarez translated the phrase "Y pos fuimos enemies" as "We were

enemies." Tr. Vol. 44 at 172–73. As set forth in the First Amended Petition, the correct translation

is "we were once enemies." First Am. Pet. at 150–51. Alvarez's translation misrepresented

Petitioner's statement, bending what Petitioner said in a way that would make it consistent with

the State's theory that the Tri-City Bombers had a "green light" on the entire Texas Chicano

Brotherhood at the time of the crime, and that Petitioner knew about this "green light." But

Petitioner's statement, *accurately* translated, conveys that he knew that the Texas Chicano

Brotherhood *were once* enemies of the Tri-City Bombers—and implies a belief that the gangs were

*no longer* enemies at the time of the marijuana robbery. Respondent fails to address these

allegations and thus perpetuates Alvarez's damaging imprecise translation.

And finally, even if there had been a feud at the time of the robbery, that hardly would have

implied that Petitioner would have expected members of the Bombitas to *kill* any member of the

---

[26] The translation is "and they said they were Chicanos."

[27] The translation is "And so we were once enemies."

[28] The translation is "since they were already there."

Chicanos they encountered; it was Alvarez's testimony about "green lights" and what they meant that provided extremely damaging – and inaccurate – information to the jury.

Thus, the prejudice caused by trial counsel's deficient performance related to Robert Alvarez's testimony is apparent. But for trial counsel's ineffectiveness in impeaching Alvarez or otherwise damaging his credibility, Alvarez's perjured testimony would not have been admitted at all, and if it had been admitted, no reasonable juror would have given it significant weight. *See supra* pp.16–18.

### 4.   *VII(4) Trial Counsel were Ineffective for Refusing to Permit Petitioner to Testify*

#### a.   Summary of the Claim

The facts in support of this claim are summarized *supra* at 18–21, and set forth fully in the First Amended Petition at 156–58.

#### b.   There is No Reason to Disbelieve Petitioner's Affidavit

Respondent argues that this claim is meritless. Answer at 74–75. The core of Respondent's Answer is the following: "Medrano fails to prove that his attorney refused to allow him to exercise his right to testify. His own self-serving affidavit, touching only on the guilt phase of the trial, is the only proof he can muster." *Id.* at 75. But the fact that an affidavit is self-serving is not sufficient grounds to disbelieve it or argue that it does not amount to sufficient evidence. If that were the case, no petitioner would ever be believed. As is the case with many of its purportedly "factual" findings, the state habeas court's finding that Petitioner's assertion was not credible—despite the lack of contrary evidence, and without the opportunity to observe Petitioner's demeanor—has no basis in the record, and simply reflects hostility to Petitioner's claim.

For an account of what Mr. Medrano would have testified about and the prejudice caused by counsel's deficient performance, *see* First Am. Pet. at 157–58.

     5. *VII(5) Trial Counsel were Ineffective for Failing to Request a Lesser Included Offense Charge of Robbery, Aggravated Robbery, or Conspiracy to Commit Robbery*

        a.  Summary of the Claim

Without the option of convicting the defendant of a non-capital lesser included offense, a juror who believed that the defendant had committed a serious offense might, despite deficiencies in the evidence or the juror's own doubts, nonetheless choose to convict him of the capital crime rather than acquit him altogether. *See Beck v. Alabama*, 447 U.S. 625, 642–43 (1980). However, "[w]here no lesser included offense exists, a lesser included offense instruction detracts from, rather than enhances, the rationality of the process." *Spaziano v. Florida,* 468 U.S. 447, 455 (1984). Consequently, state trial courts in capital cases are not constitutionally required to instruct juries on offenses that are not lesser included offenses of the charged crime under state law. *Hopkins v. Reese*, 524 U.S. 88, 97 (1998).

Here, the offenses of robbery, aggravated robbery, and conspiracy to commit robbery are lesser included offenses under state law. These offenses could have been established by "the same or less than all of the facts required to establish the commission of the offense charged," Tex. Code. Crim. Proc. Ann. Art. 37.09 (Vernon 2003), because to establish capital murder, the State had to prove all of the elements of robbery *plus* a death resulting from the robbery *plus* a more culpable mental state.

        b.  To Convict Petitioner of Capital Murder, the State First Had to Prove he Was Part of a Conspiracy to Commit a Robbery

Respondent's Answer has the same flaws as the post-conviction court's reasoning. As set forth in the First Amended Petition, these findings involved an unreasonable application of clearly established federal law under 28 U.S.C. § 2254(d)(1) and rested on an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2). *See* First Am. Pet. at 163–65.

Respondent argues that robbery, aggravated robbery, and conspiracy to commit robbery are not lesser included offenses, because Petitioner was convicted under Texas Penal Code § 19.03(a)(7), which states it is a capital offense if the person commits murder and the person murders more than one person during the same criminal transaction. Answer at 77. According to Respondent, robbery is not an element of this offense. *Id.* Respondent compares this case to *Sorto v. State*, 175 S.W.3d 469 (Tex. Crim. App. 2005), a capital case where the appellant was convicted under § 19.03(a)(7) and the TCCA denied his claim that he should have been given a lesser included offense charge of kidnapping. Respondent argues that "[r]obbery is no more a [LIO] of the murder of more than one person in a criminal transaction than kidnapping is. Trial counsel would have been wasting the court's time requesting such an instruction with no rational legal basis and is not deficient for refusing to do so." Answer at 79.

Respondent is wrong in affirming that the instruction had no legal basis, and the post-conviction court's decision in that regard, FF&CL at 339, as well as the TCCA's unreasoned rejection of the claim, involved an unreasonable application of clearly established federal law.

Even if Petitioner was ultimately *convicted* under § 19.03(a)(7), he was alleged *to have met the requirement of being guilty of murder because he had conspired to commit a robbery* during which another member of that conspiracy committed murder. Then, *additionally*, the State set out to prove the murder of more than one human being, and that Petitioner anticipated the loss of human life. Thus, robbery was a lesser included offense of capital murder. This case is not like

74

*Sorto*, because the defendant in *Sorto*, unlike Petitioner, did not have to be found guilty of kidnapping in order to meet the requirement of being guilty of murder. Further, Petitioner was charged under § 19.03(a)(7) and in the alternative under § 7.02(b). Because trial counsel could not have known under what theory—if any—the jury would convict Petitioner, it was deficient not to request a lesser included offense charge of robbery, aggravated robbery, or conspiracy to commit robbery, which are also lesser included offenses of Petitioner's charge under § 7.02(b).

Petitioner notes that Respondent fails to address two other respects in which the post-conviction court relied on an unreasonable determination of the facts and an unreasonable application of Supreme Court precedent.[29]

> 6. *VII(6) Trial Counsel were Ineffective for Failing to Assert That the Cruel and Unusual Punishment Clause Categorically Forbids the Execution of a Nontriggerman Who Was Not Present and Did Not Plan or Agree to a Murder*
>
> > a. Summary of the Claim

The facts in support of this claim are summarized *supra* at pp.22–23 and set forth fully in the First Amended Petition at 165–66.

---

[29] The second of the post-conviction court's reasons for denying this claim was that, according to that court, under Petitioner's theory, he did not know what the guns he provided would be used for and therefore he was not guilty of any of the offenses committed by the other individuals. FF&CL at 340. This mischaracterized Petitioner's defense, or if it is a factual finding, it is "an unreasonable determination of the facts" under 28 U.S.C. § 2254(d)(2). Petitioner's statement admits that he knew the guns would be used in a robbery but denies that anyone would be killed. In its third finding, the post-conviction court asserts that "contrary to Applicant's argument that the evidence was susceptible to doubt that he was criminally responsible for the murders and should not have anticipated that his fellow gang members would commit the murders, the fact of the matter is that the jury, properly instructed on the concept of criminal responsibility for the anticipated result of a conspiracy, had found that [Petitioner] should have anticipated the murders as a result of the conspiracy to commit robbery." FF&CL at 340. This statement shows that the court simply did not understand *Beck*. The rationale behind *Beck* is that without the *option* of convicting the defendant of a non-capital lesser included offense, a juror who believed that the defendant had committed some other serious offense, might vote to convict him of the capital crime rather than acquit him altogether. *Beck*, 447 U.S. at 642–43. The fact that a jury did convict the defendant of the capital offense says nothing about whether it would have done so given a more appropriate option, and thus is contrary to or an unreasonable application of *Beck*. *Id.* If this reasoning is behind the TCCA's denial of the claim, then the TCCA decision too was contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

      b.   Respondent Mistakes This Claim and Wrongly Argues Trial Counsel's Actions Responded to a Reasonable Strategy

Respondent maintains that this claim is meritless and counsel "is not deficient for failing to make boilerplate objections that have been repeatedly overruled." Answer at 72–73. But Respondent does not offer any cases to support the contention that this particular claim has been "overruled" before.

Respondent argues that counsel raised an *Enmund/Tison* objection on direct appeal, and that any further objections on these grounds would have been denied. Answer at 73. The *Enmund/Tison* objection that was denied, however, was not the claim Petitioner presents here. *See supra,* Ground IV. In particular, trial counsel did not claim that the execution of a person who was neither at the scene of the crime nor agreed to the killing is categorically by the Eighth Amendment.

Further, Respondent is simply speculating when asserting that any further objections on these grounds would have been denied and that trial counsel were not ineffective for failing to make a futile objection. Answer at 73. Respondent misses the point again: even if trial counsel initially thought this claim frivolous, it was unreasonable for them to reject it without investigating the evolution of the law and practice. Had they done so, the rarity of cases in which death has been imposed in the absence of both presence and intent, and the consequent evolving consensus against imposition of the death penalty in such cases, should have alerted counsel to the necessity of making such an objection. Their failure to do so is thus deficient performance.

    7.  *VII(7) Trial Counsel were Ineffective for Failing to Present Evidence Regarding or Retaining an Expert to Evaluate Petitioner's Adaptability to Prison*

      a.   Summary of the claim

The facts in support of this claim are summarized *supra* at pp.23–27 and set forth fully in the First Amended Petition at 167.

### b.   Trial Counsel's Decision Was Not Strategic

Respondent argues that Petitioner cannot overcome the presumption that trial counsel's decision not to call an expert witness was strategic. Answer at 82. But trial counsel did not just decide to not call an expert witness: they decided to not *consult* with any. Because "evidence . . . of 'a defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is . . . by its nature relevant to the sentencing determination[,]'" a determination not to call an expert without knowing what they could testify about cannot be deemed strategic or reasonable and constitutes deficient performance. *Tennard v. Dretke*, 542 U.S. 274, 285 (2004) (quoting *Skipper v. South Carolina*, 476 U.S. 1, 7 (1986)). This is especially so considering that, at the time of Petitioner's trial, at least two types of adaptability to confinement experts were available.[30]

### 8.   *VII(8) Trial Counsel were Ineffective for Failing to Investigate and Present Mitigating Evidence of Petitioner's Good Deeds and Character*

### a.   Summary of the Claim

Trial counsel obtained the services of a mitigation specialist, Gilda Bowen, in March of 2005, only a month before jury selection, and Ms. Bowen completed her report on the Petitioner's case three days before the punishment phase of the trial began. Affidavit of Gerald L. Byington (June 24, 2013) at 1–2, 6.[31] Ms. Bowen stated, "I have no idea what the punishment strategy was.

---

[30] Experts with experience in corrections and classification such as James E. Aiken were qualified to provide the jury with their assessments, *see Lucas v. Upton*, Civil Action No. 5:09–CV–289 (CAR), 2013 WL 1221928 at *20 (M.D. Ga. Mar. 25, 2013) (describing Aikens testimony in a 1999 trial), as were experts trained in forensic psychology. *See e.g.*, *Mark D. Cunningham, Ph.D., ABPP*, http://www.markdcunningham.com/curriculum-vitae/ (website of expert Dr. Mark Cunningham).

[31] Post-conviction counsel had a Clinical Social Worker, Gerald Byington, summarize Ms. Bowen's work and give his opinion on what could have been done in an affidavit.

Hector (Villarreal) made all those decisions." *Id.* at 3. But as co-counsel's affidavit reveals, lead counsel was focused on the guilt phase, a focus that stemmed from counsel's belief that Petitioner was innocent. Affidavit of O. Rene Flores (May 28, 2015) at 13. As a result of this single-minded focus on guilt, the defense's investigation and case at punishment suffered serious shortcomings.

Ms. Bowen recommended that trial counsel obtain the services of a gang expert. This recommendation was never followed up on. Affidavit of Gerald L. Byington (June 24, 2013) at 6, 9 ¶ 7. Trial counsel called four witnesses during the punishment phase, none of whom had much to say. Tr. Vol. 47 at 3. *See* First Am. Pet. at 171–72. Much better witnesses were at counsel's fingertips. Petitioner's wife, three sisters-in-law, mother-in-law, employers, educators, and friends all would have been willing to speak to Petitioner's lawyers and able to provide a compelling picture of the positive aspects of Petitioner's life. Affidavit of Juana Garces (May 16, 2013) at 2; Exhibit #1, Declaration of Guadalupe Garces (Jan. 6, 2018) at 2 ¶ 17–18; Exhibit #3, Declaration of Monica Garces (Jan. 6, 2018) at 2 ¶ 16–17; Exhibit #2, Declaration of Maribel Garces (Jan. 6, 2018) at 2 ¶ 15–16; Exhibit #4, Declaration of Paola Garces (Jan. 6, 2018) at 2, ¶ 17–18. Petitioner gave counsel the names of these witnesses, but counsel did not contact them. Affidavit of Rodolfo Medrano #2 (May 29, 2013) at 1–2. Petitioner also provided counsel with the name of a correctional officer with whom Petitioner spoke about leaving the gang shortly after Petitioner was arrested, and who had Petitioner moved so that he would not be endangered by the gang. *Id.* at 1. Petitioner asked trial counsel to call this officer, but trial counsel files are devoid of any evidence that he did so. *Id.* at 2.[32]

b.   The Post-Conviction Court's Decision Was Unreasonable

---

[32] The factual basis for this claim is set forth in more detail in First Am. Pet. at 171–73.

Without substantively engaging with Petitioner's arguments that show that the post-conviction court's findings were unreasonable, Respondent claims Petitioner cannot prove ineffectiveness and that the post-conviction court applied the law reasonably. Answer at 86. As demonstrated in the First Amended Petition, the state post-conviction court's adjudication of this claim both relied on unreasonable determinations of the facts and involved an unreasonable application of clearly established federal law. *See* 28 U.S.C. §§ 2254(d)(1)–(2). In particular, it was completely unreasonable for the post-conviction court to reach the determination of fact that the investigator could have done more work than she documented, or spoke to people who swore they did not speak to her. And to the extent the TCCA relied on the trial court's findings, or agreed with them, it too was unreasonable. It was also an unreasonable application of the law to the facts to conclude that this undocumented work rendered the investigation adequate—without knowing what that undocumented work might be! The post-conviction court also pointed to the absence of affidavits from Petitioner's family of origin, as though the absence of such affidavits rendered the affidavits from Petitioner's in-laws worthless. Such an inference was particularly unreasonable given that Petitioner lived with his in-laws at the time, and they therefore were better sources of information about his virtues as a father and husband. Moreover, nothing in this case required trial counsel to choose between investigating what Petitioner's family of origin could contribute and what his in-laws could contribute. Finally, Respondent has offered no theory suggesting how the failure to take the minimal step of talking to the relatives with whom Petitioner lived could have been a strategic decision.

With respect to the failure to hire a gang expert, Respondent rightly states that counsel "cannot be considered ineffective for not hiring every kind of expert to contest the State's case or develop a theory that might have supported Medrano's defense." Answer at 86. But counsel did

not retain any expert at all, and counsel did not seek funding for a gang expert, or any other expert, for that matter. Trial counsel were ineffective because, in a case where gang membership was an extraordinarily critical part of the case for death, failing to retain a gang expert was a terrible decision; such an expert could have shed mitigating light on the reasons why individuals join gangs, and responded to the fears that Petitioner would be active in prison gangs. *See* First Am. Pet. at 172. Trial counsel's failure to do so is especially unreasonable given that the mitigation specialist had suggested they do just that. Affidavit of Gerald L. Byington (June 24, 2013) at 6; 9 ¶ 7.

Respondent also argues that because there is no evidence that counsel failed to investigate, Petitioner departs from the holding of *Wiggins*. Answer at 86. "Medrano cannot show evidence that counsel did not consider the options and discard them for a strategic reason." *Id.* at 87. However, the assertion that there is no evidence that counsel failed to investigate is incorrect. As co-counsel's affidavit reveals, the failure to do a thorough investigation was due to lead counsel's focus on the guilt phase. Affidavit of O. Rene Flores (May 28, 2015) at 13.

Co-counsel Flores also stated that lead counsel Villarreal did not believe Petitioner's education or employment records were a necessary contribution to Petitioner's case. *Id.* at 10. However, Villarreal did not obtain those records before he made that choice, and a strategic choice made on less than adequate investigation is not reasonable. *See Wiggins v. Smith*, 539 U.S. 510, 527 (2003) ("*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy.")

The Flores affidavit proffers another spurious reason for the failure to investigate: There were few witnesses who could testify on behalf of Petitioner without admitting Petitioner's gang

80

affiliation, and Villarreal believed that it was harmful to show jurors the double life that Petitioner had been leading. Affidavit of O. Rene Flores (May 28, 2015) at 11–12. Of course, without conducting a mitigation investigation, it would be impossible to know whether there were witnesses who would not have had to acknowledge Petitioner's gang affiliation. More importantly, this is not a case where potential mitigation witnesses might have revealed harmful information *that was otherwise unknown to the jury*; the jury would have had no doubt about Petitioner's gang affiliation. Finally, any choice to avoid presenting evidence of Petitioner's hard work and devotion as a husband and father in order to avoid the appearance of him living a double life was a patently irrational one; it could not have been better for the jury to assume that he had a life solely devoted to crime and gang membership. Thus, Flores's affidavit, by providing unreasonable explanations for the failure to investigate, actually supplies evidence that counsel's failure to develop and present mitigation evidence did not stem from reasonable strategic decisions.

Respondent also argues that, unlike the defendant in *Wiggins*, Petitioner presents no evidence that trial counsel was unaware of: "It is absurd to suggest that counsel was unaware that Medrano had a family, a job, and a life outside of his gang activities. The various people that Medrano suggests counsel should have investigated and called to testify that he was a good person, would have presented the exact type of evidence that counsel made a reasonable strategic reason not to use." Answer at 87–88. Respondent misses the point: trial counsel was ineffective precisely because he *knew* about them but failed to *investigate* what kind of testimony they would have offered. *See* First Am. Pet. at 175–76. There being absolutely no valid reason for his failure to investigate potentially mitigating sources of evidence of which he was aware, his performance was deficient.

Respondent also cites to the assertion in Flores's affidavit that his consultations with the neuropsychologist Dr. Milam informed his decisions about the mitigation case. Answer at 87–88 (quoting 3 CR 959–64).[33] In particular, according to Flores's affidavit, Dr. Milam influenced the decisions not to take the stand herself and the decision not to call Petitioner's family members. 3 CR 960, 963. But Flores does not claim, and nothing in the record suggests, that Dr. Milam *herself* talked to Petitioner's family members either. Thus, any purported reliance on Dr. Milam's opinion would itself have been unreasonable, given that neither counsel nor Dr. Milam had sufficient information to make an assessment of the potential value of the testimony of those family members.

         *9. VII(9) Trial Counsel were Ineffective for Failing to Adequately Voir Dire Prospective Jurors*

            a.  Summary of the Claim

Although this case involved six victims, trial counsel failed to probe jurors' willingness to consider mitigation and openness to a life sentence in a case with multiple victims. Especially in capital cases, "certain inquiries must be made to effectuate constitutional protections . . . ." *Morgan v. Illinois*, 504 U.S. 719, 730 (1992). A defendant is entitled to make an inquiry into potential jurors' ability to consider a life sentence *in the defendant's case*, not merely as an abstract matter. *Id.* at 739.

Here, trial counsel made no such inquiries. Trial counsel failed to voir dire potential jurors regarding their willingness to consider mitigation or their openness for a life sentence *in a case involving multiple homicides*. This constitutes defective performance by counsel. Given the number of victims, counsel should have done everything possible to ensure that each juror could

---

[33] "CR" refers to the Clerk's Record.

fairly weigh the facts, consider proffered mitigation, and give meaningful consideration to a sentence less than death *in this case*. Counsel's deficient performance prejudiced Petitioner by risking that a juror who would never consider a life sentence in a multiple homicide case would sit on the jury. Because such jurors are not rare, and because a juror open to the facts of the case and to mitigation could have found a death sentence inappropriate given Petitioner's limited role in the crime, there was a reasonable probability of a different sentence absent counsel's deficient performance.

> b.  Trial Counsel's Decision Not to Ask the Jurors Questions About Cases Involving Multiple Victims Was Unreasonable

Respondent argues that this claim amounts to disagreement over trial strategy, that the state post-conviction already denied this claim, and that "Medrano has not summoned any law or facts to support his allegation that the denial was unreasonable." Answer at 90.

To the extent the post-conviction court's denial of this claim rests on a factual determination, it depends upon an unreasonable determination of fact under 28 U.S.C. § 2254(d)(2): that the listing of the number of homicides on the indictment guarantees that jurors would interpret counsel's questions to apply specifically to cases involving multiple victims. To the extent the post-conviction court's opinion rests on a determination that counsel had no duty (or right) to inquire whether a juror could consider mitigation or consider a sentence less than death *in a case involving multiple victims*, it is an unreasonable application of Supreme Court precedent under 28 U.S.C. § 2254(d)(1). There is no conceivable strategy that would lead to failing to voir dire the prospective jurors with questions tailored to the facts of this case.

Respondent claims that Petitioner "fails to demonstrate, or even allege, that an impartial juror sat on his jury." Answer at 89. It is unclear what Respondent means; all jurors are meant to

be impartial. If Respondent means *partial*, this too is nevertheless irrelevant. Petitioner does not have to show a juror was *actually* partial, just that absent counsel's error there is a *reasonable probability* that at least one different juror would have served, and that such a juror would have been persuaded by Petitioner's limited role in the offense that death was not the appropriate sentence.

## VII.   GROUND VIII: PETITIONER WAS DEPRIVED OF HIS FIFTH AMENDMENT RIGHT TO TESTIFY IN HIS OWN DEFENSE.

### A.  Summary of the claim

All of the facts described in VII(4) above are incorporated here by reference.

### B. The TCCA's Denial of This Claim Was Based on an Unreasonable Determination of the Facts

This claim was raised in post-conviction proceedings and denied based on unreasonable factual determinations. 28 U.S.C. § 2254(d)(2). The decision was unreasonable because the claim raised disputed issues of fact and the state post-conviction courts adjudicated it without an evidentiary hearing— despite the absence of record support for its factual findings.

Petitioner's affidavit asserts that he clearly remembers the discussions he had with Villarreal relating to whether or not he should testify, and provides corroborating detail. Petitioner told Villarreal of his desire to testify on more than one occasion, and Villarreal appeared to acquiesce, telling Petitioner "to get mentally prepared." Sworn Inmate Declaration of Rodolfo Medrano (July 8, 2015) at 2. Petitioner also recalls Mr. Villarreal saying, "it's your life on the line." *Id.* In contrast, co-counsel O. Rene Flores lacks both detail and certainty.  He vaguely recalls Villarreal explaining trial strategy to Petitioner as a game of chess and that Petitioner "yield[ed] to Mr. Villareal . . . when it came to different matters." Affidavit of O. Rene Flores (May 28, 2015) at 15. However, Flores cannot recall whether or not "this was the case with [Petitioner]'s

testimony. *Id.* His only explanation for his lack of recollection is that Petitioner had a closer relationship with Villarreal than he did with Flores. *Id.*

"At this juncture, the only non-speculative evidence in the habeas record is [Petitioner's] statement that counsel refused to allow him to testify." *Ex parte Medrano*, 532 S.W.3d at 398 (Alcala, J., dissenting). Thus, there is no record support for the post-conviction court's finding (or the TCCA's implicit finding) that Petitioner was not denied his right to testify, and contrary to Respondent's assertion, the state court's decision rested on an unreasonable determination of the facts.

## CONCLUSION

For the foregoing reasons, along with those set forth in the First Amended Petition, and Petitioner's Motion for a Stay of Proceedings and Reply, this Court should deny Respondent's motion for summary judgment. It should grant Petitioner's pending motion for a stay so that he may pursue available state court remedies, or grant the writ of habeas corpus.  If it does neither, it should grant Petitioner's motion for an evidentiary hearing.

Respectfully submitted,

SHERI LYNN JOHNSON
NY Bar # 1685429
Cornell Law School
245 Hughes Hall
Ithaca, NY 14853
(607) 255-6478; (607) 255-3269 (fax)

Stephen Byrne
Texas Bar # 24050365
American Bank Plaza
711 N. Carancahua Street, Suite 512
Corpus Christi, Texas 78401
(361) 877-2099; (361) 288-8932 (fax)

By: s/Sheri Johnson

SHERI LYNN JOHNSON

October 4, 2019.

## CERTIFICATE OF SERVICE

I do hereby certify that on October 4, 2019, I electronically filed the foregoing pleading with the Clerk of the Court for the U.S. District Court, Southern District of Texas, using the electronic case-filing system of the Court. The electronic case-filing system sent a "Notice of Electronic Filing" to the following attorney of record, who consented in writing to accept this Notice as service of this document by electronic means:

RACHEL L. PATTON*
Assistant Attorney General
State Bar No. 24039030
Southern ID. No. 3120286

P. O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 936–1400
(512) 936–1280 (Facsimile)

ATTORNEY FOR RESPONDENT

By: s/Sheri Johnson

SHERI LYNN JOHNSON